By the Court, Morgan, J.
There are so many exceptions in this case, that I do not propose to take them up in detail. The most I can do is, to arrange them in groups, and deal with them in that form. The statement of the case shows that the plaintiff left with the cashier of the old bank the sum of $1,300, to be em *332 ployed in the'purchase of 5-20 bonds ; that he paid him the money over the counter of the bank, and took a receipt dated at the Mohawk Valley Bank, stating the object of the deposit. The receipt was signed by R. H. Pomeroy. Afterwards the cashier informed him that he had made the purchase of the bonds, and by his request they were to be left at the bank, for safe keeping. When the interest had become due, the plaintiff called at the bank and it was paid to him over the counter of the bank. He then gave a receipt to the Toante for the money. The plaintiff testified that he supposed that he was dealing with the bank, and not with the cashier personally; and the language of this receipt would seem to confirm it. At all events it was a question for the jury to determine, whether the plaintiff intended to deal with the bank, or to take the personal obligation of the cashier; and we ought, therefore, to assume, after verdict in favor of the plaintiff, that the plaintiff supposed he was dealing with the bank ; for that question was properly submitted to the jury, and they must have found that such was the fact.
The judge correctly charged that in aft transactions in which the bank might lawfully engage, the cashier is the managing agent, and speaks for the corporation. The cashier is usually entrusted with all the funds of a bank, to be used from time to time for the ordinary and extraordinary exigencies of the bank. In that, he is considered the executive officer, through whom and by whom the whole moneyed operations of the bank in paying and receiving debts, or discharging or transferring securities, are to be conducted. (Ang. and Ames on Corp. 295.)
He is the general manager, and unless his operations are restricted by the directors, he is, for many purposes, looked upon by the law, and is treated as if he was, the whole body, whom he has power to bind, even by his tortious act. (Grant on Banking, 518.)
*333 There does not appear to me to be any essential difference between the powers of a cashier who is allowed to manage all the affairs of a bank, and that of a manager of a branch bank in Great Britain. It is there said, that if a local manager of a branch bank gets into his hands the money of a customer of the bank, by inducing the customer to consider that he is acting in the transaction as agent of the bank, and is invested.with authority to effect the purchase for which the customer confides the money to him, and then appropriates the money to his own purposes, the customer’s loss will fall upon the copartnership.
To hold the bank not to be liable in such a case, would be, it has been said, to hand over the public to the mercy of the clerks employed by these banks. The principle seems to be, that the manager is a servant whom the bank, for the purposes of trade, virtually accredits, and holds out to the world as invested by them with general authority to act for them in the affairs of the branch bank, and the public have no power or means to discriminate what is and what is not, in any particular case, within the legitimate scope of the agent’s powers, or in accordance with the directions of his masters ; and therefore, when a customer, in a matter belonging to his relations to the branch bank, confides in the servant, he in fact trusts his masters, and they are liable accordingly for the fraud of the servant whom they have chosen. (Grant on Banking, 518, 519.)
Let it be granted that the cashier, instead of employing the plaintiff’s funds to purchase bonds, converted them to Ms own use; if the plaintiff supposed that he was dealing with the bank, and the business of buying bonds was one authorized by the bank, and not prohibited by the charter, the fact of a misappropriation of the bonds by the casMer, furnished no defence whatever, flor is it any defence to this action that there was an understanding between the bank and cashier that he should *334 do that kind of business on his own account and have the profit of it; unless that fact was brought home to the plaintiff; provided the evidence was such as to authorize the jury to find, as a matter of fact, that the bank held out its cashier as authorized to engage in that kind of business in behalf of the bank, and the business itself was such as could be legally performed by the bank. Any verbal understanding between the cashier and the directors will not avail to limit his authority, when the acts of the cashier are performed over the counter of the bank, and are of a public character and numerous and long continued. .In such a case it is reasonable to presume that they are in conformity with the instructions of the directors. So will the bank be bound by the acts of the cashier if the directors, either through inattention or otherwise, suffer the cashier to pursue a particular line of conduct for a considerable period, without objection. (Beers v. Phœnix Glass Co., 14 Barb. 358.) Thus where the directors of a bank allowed its cashier to conduct all its business without interference, for several years together, they were held thereby to have conferred upon him authority, as to third persons, to transact any business on behalf of the bank which he was not prohibited by its charter from transacting. (City Bank of New Haven v. Perkins, 4 Bos. 428. And see Alleghany City v. McClacken & Co., 14 Penn. 83, Coulter J.)
The evidence in this case showed that the bank was engaged in purchasing bonds to deposit for circulation; also for the purpose of investing its surplus funds ; and that these bonds were sold as the bank required money to carry on its operations; that through its cashier, purchases of bonds were made for various individuals, as well as for officers of the bank ; that these bonds were often deposited in the bank for safety, and the interest collected by the bank and paid over to the owners of the bonds. This kind of business, in all its forms, was *335 carried on through the cashier, for several years, without objection or interference by the directors, and his authority to act for the bank in that business was never called in question until it was ascertained that he was a defaulter.
It is now insisted by the defendant that the purchase of bonds by the bank for its customers was not a legitimate business, and that it was not permitted by the articles of association, or the laws of the State, or of Congress. It is not denied that the practice was highly meritorious and of great benefit to the United States treasury. One of the objects of the creation of the national banks was to aid the United States treasury in borrowing money on the credit of United States bonds ; and all the banks of this State, with hardly an exception, became the voluntary agents of the government in procuring loans, in this manner. They solicited and received the money of individuals and invested them in United States bonds. This was of course done through the cashier as the financial officer of the bank, and it enabled the banks to handle the funds and greatly enlarge their operations.
It is made a question whether this was a legitimate business for the bank to engage in. As a general rule, a corporation is not bound by the acts of its agents, unless they come within the general powers conferred upon it by its charter. There may be exceptions, where it appears that the corporation has had the benefit of the deposit, and cannot, in justice, return such benefit; but here the defendant offers to show that the bonds were converted by the cashier to his own use, and were never applied to the use of the bank. In such a case, it will hardly be contended that the bank is liable, if the contract is one which the bank was forbidden to make.
But the banks have so long been engaged in acting as agents of the United States treasury in the business *336 of investing'their own, as well as their customers’ money in United States bonds, without any objections from the directors or stockholders, and with the sanction of the general government, too, that it would be wrong for the courts to pronounce the business ultra ñires and illegal, without the most satisfactory reasons for adopting such a conclusion. I see no good reason why the courts should condemn a transaction which has so many sanctions to uphold it; and I think the tendency of modern, decisions is, to hold banks responsible for all contracts which are not forbidden by their charters or some positive statute; especially in favor of those who are not supposed to be acquainted with the limitations of their powers. Certainly there was nothing illegal in the transactions complained of, or against public policy. In such a case, the practice of the cashier, with the sanction of the directors, or without any objections from them for so many years, ought, I think, to be treated as furnishing sufficient evidence that it was authorized by the corporation; and as to third persons, the acts of the cashier, which he apparently performed as an officer of the bank, over the counter, should be regarded as the acts of the bank, and binding upon the corporation. The only remaining question is, whether the court committed any error upon the trial, which was of sufficient importance to require a new trial.
After the evidence was all in, the defendant moved for a nonsuit, and now insists that the plaintiff should have been nonsuited upon four distinct grounds. (1.) Because it was not proved that the bank ever received the $1,300 of the plaintiff. (2.) Because it was not proved that the plaintiff ever had the 5-20 bonds at the bank. (3.) Because, if the bank had such a bond, the evidence shows that it was lost without any gross negligence on the part of the bank. (4.) Because it does not appear that the bank held the plaintiff’s bond when it was demanded.
*337 An answer to these objections will necessarily dispose of one class of exceptions.
Several questions were put to the president and other officers of the bank, as to whether or not the bank ever received the plaintiff’s money. These questions were properly overruled on the distinct ground that they called for a legal conclusion.
The books of the bank and the cashier’s account, and all the entries in the books, were offered in evidence to prove that the money of the plaintiff was never used for the benefit of the bank. This kind of evidence was entirely useless and immaterial. It was no defence, as we have séen, to show that the cashier had misappropriated the money, which is all the evidence would prove, provided the contract was made with the cashier while professing to act as an officer and agent of the bank.
It was a fact for the jury to determine, and' not the witnesses, whether the contract was made with the bank or with the cashier as an individual. The exceptions taken to the exclusion of this class of evidence, are, I think, wholly untenable.
The second objection is, that it was not shown that the plaintiff ever got a bond for his money. The only evidence is that of the plaintiff, who testified that the cashier told him he had purchased the bonds. It is made a’question whether this fact could be proved by the declarations of the cashier. If the case depended upon such a fact, it would be worth while to examine it somewhat critically. As a general rule, the cashier is the mouth-piece of the corporation, and it is his business to respond in behalf of the bank to all inquiries touching transactions growing out of the relations of the bank with its customers.
In my opinion, he is competent to make an admission in reference to the purchase of the bonds, which would be binding upon the bank. But I do not deem the *338 question as one • necessary to be decided upon this motion, for the bank itself denied that the bond had been purchased; and the verdict is evidently based upon the theory that the cashier, instead of purchasing a bond for the plaintiff, appropriated the money to his own use. No such bond was ever seen by the clerks or officers of the bank, and no envelope could be found with the plaintiff’s name on it, as in the case of others who had entrusted them money with the cashier under similar circumstances for the purchase of bonds.
I think, therefore, it may be, and perhaps ought to be, assumed that the cashier converted the funds of the plaintiff to his own use, instead of having purchased a bond as he represented to the plaintiff he had done. And in my opinion the verdict of the jury may be sustained upon the ground that the bank is responsible for the misappropriation of the plaintiff’s money by the cashier. This view of the case would dispose of all the evidence and the exceptions, growing out of the same, relative to the conversion or loss of the bond after it had been left in the bank for safe keeping, and the assumed negligence of the bank in respect thereto.
I will, however, observe, that if it is assumed that the plaintiff left his bond in the bank for safe keeping, or as collateral security for the payment of his note, the neglect of the bank to deliver it up on demand would be, prima facie, sufficient evidence of conversion. And, in my opinion, the bank could not excuse itself without showing, affirmatively, what had become of it. This, I think, the defendant failed to show. The inference is very strong that if the bond was ever bought and put in an envelope for the plaintiff, it was afterwards mixed up with other bonds in the bank and used in the expectation of being replaced by another bond, when it was wanted.
It seems no list of the bonds was made; that the numbers and denominations were not registered upon *339 the books of the bank, so that their identity could be determined or their ownership known. They were only known by the name marked upon the envelope. The bonds belonging to the bank were held together by an India rubber string only. This loose mode of keeping the bonds belonging to the bank, as well as to individuals, enabled the cashier, or others having access to them, to mix them up together and use them indiscriminately. How many of the bonds belonging to individuals, and left in the bank for safe keeping, were thus used by the cashier as the bonds of the bank, and then replaced by other bonds of the same amount, it is impossible to conjecture. It will be noticed that the officers of the bank, after the removal of the cashier, found bonds enough to answer the call of the bank, and that the deficiency was found to occur only in cases of individuals—the plaintiff among the number. The bare fact that no envelopes were found with their names on, is not very important. In my opinion, the bank was guilty of great negligence in not keeping a list of these bonds ; and if they cannot be found and identified, the loss ought to fall on the bank, and not on the customers of the bank. The verdict of the jury, therefore, may be sustained upon either view of the question; whether the cashier bought the bonds, or converted the funds to his own use, without having bought any bonds for the plaintiff.
As to the fourth ground upon which the defendant moved for a nonsuit, it will be a sufficient answer to say that there was no account given which satisfactorily explained what had become of the bond, if it had been in fact purchased and left in the bank under the circumstances stated in the plaintiff’s evidence. Assuming that it was left in custody of the bank, it devolved upon the defendant to show what had become of it. It was claimed that the evidence produced, and that offered by the defendant, would have authorized the jury to find *340 that it had been stolen or embezzled by the cashier. If this was so, it was no reason for granting a nonsuit; although, if legal evidence was rejected tending to prove that the bond had been stolen or embezzled by the cashier, it would be error for which a new trial should be granted. .
And this brings us to the question whether the exceptions to that species of evidence were well taken—a question which was not discussed by the defendant’s counsel upon the argument, and which does not require a critical examination.
The evidence, rejected related to the conduct of the cashier after his suspension, and to the extent of his defalcations, from which it was sought to be inferred that he was guilty of embezzling the plaintiff’s bond, for which the bank would not be responsible. It is sufficient to say, that such evidence was inadmissible to prove the fact, and that it was properly rejected. Exceptions were also taken to the evidence of several persons who had purchased bonds through the cashier of the bank in the same manner the cashier agreed to purchase bonds for the plaintiff. This evidence, doubtless, tended to show that the cashier made such purchases frequently, over the counter of the bank, without disclosing the fact, if it was a fact, that he was doing this kind of business on his individual account. It was, in my opinion, admissible for that purpose. It wa$ important evidence to establish the fact that this kind of business was openly and frequently done by the cashier, apparently on behalf of the bank; and the-evidence was important to enable the jury to determine whether the cashier was permitted to transact that business as an officer of the bank, and apparently on its behalf. And proof by the defendant, which was offered and rejected, that certain persons knew that the cashier assumed on some occasions to act as agent for the government in receiving subscription' for bonds, would not lessen the *341 weight of the evidence. It is claimed, by the defendant, that Pomeroy, the cashier, was the agent of the United States treasury in the business of purchasing United States bonds—that he held an appointment as such, and duly advertised the same in the newspapers of the county where he resided, and that the plaintiff was affected by such publications, although there was no proof that they came to his actual knowledge. The court ruled out the evidence as to the publication of this agency, in the newspapers, because it was not shown that they came to the plaintiff’s knowledge. While I am of opinion this ruling was correct, ‘for the reason given, there is another view of the case, which will dispose of this part of the defence. The agency of Pomeroy was under the act of congress entitled “An act to authorize a national loan, and for other purposes, approved July, 1861,” and there is no authority conferred upon the secretary of the treasury to create any such agency for the purchase of United States bonds. The agency of Pomeroy was conferred by the act in question, as well as by the terms of his appointment, to solicit subscriptions for “treasury notes.” By the terms of section third of the act in question, as well as by the condition of-his official bond, his agency for obtaining subscriptions to said national loan, only authorized him to open a book for subscriptions for treasury notes for $50 and upwards, authorized by the said acts, and to receive payment for and on account of such treasury notes. (See § 3.) There is nothing in the act of congress, or in the terms of the appointment, which conferred any authority whatever upon Pomeroy to solicit purchases for the coupons or registered bonds authorized by the said act, or to receive payment therefor. This was a business outside of his agency, for which he was no more qualified to act than the corporation of which he was the cashier. Besides, the agency of Pomeroy could *342 not continue beyond July 17, 1862, when it expired by its own limitation.
As this was the only agency of the cashier, in which he was authorized to act for the general government, as an individual, there is no ground upon which it can be claimed that it covered his subsequent transactions in buying and selling United States bonds ; and knowledge that he held such an appointment in 1861, would not, I think, affect the plaintiff or others who did business with him over the counter of the bank, in the purchase and sale of United States bonds, after 1862.
A question is made that Pomeroy, by signing his name to the receipt for the $1,300, without the addition of the word “cashier,” implied that it was his individual contract. But as it was dated at the bank, it was at most a case of doubt, upon the face of the receipt, whether it was a private or official act. In such a case, parol evidence was admissible, to show that it was an official act, though the money was credited on the books of the bank to the cashier’s private accounts. (Merchants Bank v. Bank of Columbia, 5 Wheat. 326.) And it was properly left to the jury to decide, under the circumstances of the case, whether the contract was that of the bank or-of the cashier in his individual capacity. ' And, as has been already stated, the receipt given by the plaintiff directly to the bank for the payment of interest on account of the receipt of the $1,300, is a very strong circumstance to show that he supposed he was dealing with the bank. The evidence, on the face of it, therefore, predominates in favor of its being a bank transaction.
The judge charged the jury that when the financial officer of the bank makes a contract and receives the money over the counter, with an individual, which is not within the scope of the charter, and which the legislature never contemplated the' bank should make, if the bank does not perform the contract, it is *343 responsible for the money. Although the appellants complain of this proposition of the learned judge on the trial, I do not see as they have attempted to refute it. The only answer to it is, that the evidence does not show that the cashier made the contract in behalf of the bank. It is, however, said by the appellant’s counsel, that it was a contract the bank could not make, and that in fact the bank did not receive the money. And it must be assumed, upon this appeal, that the money was not appropriated to the use of the bank, but to the use of the cashier; for the evidence offered and rejected tended to prove that such was the fact.
This is, doubtless, the most embarrassing part of the case. But I have already come to the conclusion that the bank could engage in that kind of business, and that it was not prohibited by law. If I am right in this conclusion, the question raised by this part of the charge is not material.
But if it is conceded that the contract was ultra ñires, and not within the scope of the charter, still I am inclined to believe that the bank would be liable to refund the money in the case stated by the judge in his charge. The case supposed is, where the officers hold out the cashier as the agent of the bank to receive the money of customers for purposes not within the legitimate business of the bank. The customer of course does not know that his money goes to the credit of the cashier; but he is misled, in the case supposed, by the officers of the bank, into the belief that he is dealing with the corporation. In other words, the proposition charged by the learned justice is, that if the directors request the customer to give his money to the cashier over the counter of the bank, to be employed in a matter outside of legal banking, and the cashier takes his money and agrees, on behalf of the corporation, to invest it in the purchase of stocks for the customer, which the charter does not allow the bank to deal in, but which the *344 bank, nevertheless, does deal in, and the cashier, instead of investing the money according to the agreement, converts it to Ms own nse, an action will lie against the bank, by the customer, to recover back his deposit. The action in such a case is in disaffirmance of the contract. And although the bank, as such, did not in fact have the benefit of the deposit, it requested the customer to enter Mto the contract with the cashier on behalf of the bank. Upon familiar principles applicable to the law of principal and agent, the bank, in such a case, is es-topped from denying that it had the customer’s money. It may, perhaps, admit of question, whether an action will .lie to recover a deposit left M the bank," to be employed in an illegal enterprise. But the tendency of modern decisions is to sustain an action to recover back the deposit in such a case; uMess the evidence on the part of the plaintiff necessarily discloses the illegality of the transaction and the case is one where the plaintiff is clearly in pari delicto. It is said by Comstock, Ch., J., in Bissell v. The Michigan S. and N. Indiana R. R. Companies, (22 N. Y. 269,) that the words ultra vires, and illegatity, represent totally different and distinct ideas ; and Ms oprnion was that the contracts of corporations made in excess of their rightful powers,, but free from any other vice, are not illegal in the sense of the maxim.
But I regard it as unnecessary to discuss these questions at length, or to pass upon them on this appeal.
If the court should be of opinion that the bank could legally engage in the business of buying and selling United States bonds on behalf of its customers, as well as on its own behalf, then the consideration of the other questions may be dispensed with.
If the court should be of opiMon that the contract was in excess of the powers conferred on the corporation, but not illegal, then I am of opinion that the case was properly presented to the jury; and'they having found *345 that the contract was made by the cashier on behalf of the bank, under the authority of the directors, either real or apparent, the defendant is responsible for the money left by the plaintiff at the bank, whether the same was applied to the use of the cashier or the corporation itself.
[Onondaga General Term,
October 5, 1869.
Bacon, Foster, Mullin and Morgan, Justices.]
If the money was used to purchase bonds for the plaintiff, and the bonds were left by the plaintiff on deposit in the bank, then I am of opinion, that the defendant failed to account for them by any satisfactory explanation, on the trial.
And I have been unable to discover any grounds of error, either in the admission or rejection of evidence, or in the charge of the judge to the jury, of sufficient importance to call for a new trial.
I am, therefore, in favor of affirming the order of the justice at the circuit, refusing the defendant a new trial. The order should be affirmed and a new trial denied, with costs.
Ordered accordingly.