JOHN OUDERKIRK, Respondent, v. THE CENTRAL NATIONAL BANK OF TROY, Appellant.

A bailee, whatever the character of the bailment may be, is, when its purpose is fully satisfied, bound, upon request, to re-deliver the thing bailed to its lawful owner.

To justify a refusal to return the property, on the ground of a loss thereof, the burden is upon the bailee of showing the exercise by him of due care according to the nature of the bailment.

*It seems,* such re-delivery may be excused in the case of a bailment mutually beneficial to the parties, by proof that the deposit has been lost or destroyed without negligence or want of such care on the part of a bailee as prudent men under similar circumstances commonly take of their own goods.

*It seems,* also, that in the case of gratuitous bailments the bailee is only chargeable with gross neglect.

In an action to recover for the conversion of certain bonds, it appeared that plaintiff, a regular customer of defendant, deposited the bonds with it as collateral security for discounts. Discounts and renewals upon the security of such bonds were obtained by plaintiff, from time to time, during a period of four years. When the last note so discounted was paid, defendant's cashier, at his own suggestion, delivered to plaintiff a receipt signed by him as cashier, acknowledging the receipt of the bonds as collateral and stating that all loans having been paid, the bonds were retained for future like use or safe keeping, subject to plaintiff's order. Defendant thereafter, as it had done before, paid the coupons falling due on the bonds to plaintiff until October, 1887. In February, 1888, plaintiff demanded a return of the bonds but was informed that they could not be found; no information was afforded him in respect to the circumstances attending their disappearance or the mode by which they had been removed, if at all, from the possession of the bank. Upon the trial defendant gave evidence tending to show that it was its custom to return securities, held as collateral, to the owner upon payment of loans; that while held they were kept with other valuable securities belonging to defendant in a steel box inclosed in an iron safe; that the safe and box had combination locks, the combination on the box being known to defendant's president and cashier alone and the latter alone having the key. It was also proved that the cashier had been in defendant's employ for many years and had borne a good reputation until December, 1887, when he was removed for the alleged reason that he was a defaulter. All of defendant's officers, except said cashier, testified that they had no knowledge of its possession of the bonds or of the place where they were kept after the loans were paid, and that they, respectively, had not abstracted them. Defendant's by-laws provided for the appointment by its presi-

dent, once at least in every three months, of a committee, consisting of two members of the board, who with the president and cashier should constitute a committee of examination, and they were required to examine all matters "pertaining to the affairs of the institution" and report the same. Examinations were only made once in six months by three examiners and were confined to the securities owned by defendant and those it held as collateral for unpaid loans. The reports showed no account of such collaterals or of special deposits. Defendant was accustomed to receive special deposits from its customers for safe keeping, which were usually kept in the vault, but were not entered upon its books, and no subsequent examination, inspection or report in relation thereto was ever made or provided for. No other evidence was given as to the disappearance of the bonds. Defendant's cashier was not called as a witness. *Held,* that defendant was not a gratuitous bailee, but the bailment was one for mutual benefit, and it was liable, at least, for failure to exercise ordinary and reasonable care and diligence in the custody of the bonds; that it was within the authority of the cashier to make the agreement on its part to continue as custodian of the bonds, for the purposes for which they had theretofore been used, and the fact that all the loans were paid did not change the character of its liability; that the evidence failed to show the exercise on its part of the requisite degree of care and justified a submission of the case to the jury and a verdict for plaintiff.

Reported below, 52 Hun, 1.

(Argued January 16, 1890; decided February 25, 1890.)

APPEAL from judgment of the General Term of the Supreme Court in the third judicial department, entered upon an order made March 16, 1889, which affirmed a judgment in favor of plaintiff entered upon a verdict.

This action was brought to recover for the alleged conversion of certain United States bonds.

The facts so far as material are sufficiently stated in the opinion.

*Orin Gambell* for appellant. The cashier of a bank has no power to bind the bank by a contract to receive securities on deposit unless he is authorized so to do by the direction of the managers of the bank, or unless such authority may be implied from the ordinary course of business of said bank. (*F. N. Bk.* v. *O. N. Bk.,* 60 N. Y. 279, 291; *United States* v. *City Bk.,* 21 How. [U. S.] 356; *Fleckner* v. *Bank,* 8 Wheat. 457; *U. S. Bk.* v. *Dunn,* 6 Pet. 51; *Dabney* v.

*Stevens,* 10 Abb. Pr. [N. S.] 39 ; *Adriance* v. *Roome,* 52 Barb. 399 ; Morse on Banks and Banking, 156, 157 ; *Morse* v. *M. N. Bk.,* 1 Holmes C. C. Rep. 209 ; *Elwell* v. *Dodge,* 33 Barb. 336 ; *State Bk.* v. *Perkins,* 4 Bosw. 420 ; *C. N. Bk.* v. *Koner,* 8 Daly, 530.) A national bank has power to agree to receive, as gratuitous bailee, securities to be deposited in its vaults for safe keeping, and is liable to the depositor thereof for such securities which are lost through its gross negligence. (*Pattison* v. *S. N. Bk.* 80 N. Y. 82 ; 17 Hun, 419 ; *Foster* v. *Essex Bk.,* 17 Mass. 478 ; *Scott* v. *Bank,* 72 Penn. St. 478 ; *L. C. N. Bk.* v. *Smith,* 52 id. 47 ; *F. N. Bk.* v. *Graham,* 79 id. 106 ; *Turner* v. *F. N. Bk.,* 26 Ia. 562 ; *Smith* v. *F. N. Bk.,* 69 Mass. 605 ; *C. N. Bk.* v. *Schley,* 51 Ga. 369.) The defendant having been from January 26, 1887, a gratuitous bailee of these bonds, it can be made liable only for gross negligence. (*Scott* v. *N. Bk.,* 72 Penn. St. 478.) If the court shall be of opinion that the Central National Bank was not merely a gratuitous bailee of these bonds after the 26th day of January, 1887, then in that case the rule of diligence required of the bank as laid down by the court in the charge to the jury is erroneous and demands a greater degree of diligence upon the part of the bank than can be sanctioned by law. (Edwards on Bailments 6, 7, §§ 234, 235 ; *Erie Bk.* v. *S. R. & Co.,* 3 Brewster, 9 ; *St. Losky* v. *Davidson,* 6 Cal. 643 ; *Jenkins* v. *N. V. Bk.,* 58 Me. 275 ; *Schmidt* v. *Blood,* 9 Wend. 268.) The bank is not liable unless it can be shown that Mr. Wickes had been an incompetent person and that the bank was careless in keeping him in his position, knowing that he was incompetent either for want of capacity or for want of moral character. (*Scott* v. *N. Bk.,* 72 Penn. St. 479 ; 1 Blackst. Comm. 429 ; *M. Bk.* v. *Bk. of Columbia,* 5 Wheat. 326.) There is an obligation upon the plaintiff to prove in some way lack of ordinary care ; and if he does not prove it, then he has not made out his case. (*Fleming* v. *N. N. Bank,* 62 How. Pr. 179.)

*J. M. Landon* for respondent. The bank had power to receive the bonds, either as collateral security or as a special

deposit for safe keeping. (*Pattison* v. *S. N. Bank*, 80 N. Y. 82.) The bank cannot successfully claim that the bonds were left with the cashier as an individual and not with the bank, and that the cashier had no authority to make the agreement for the bank. (*Caldwell* v. *M. Bank*, 64 Barb. 333–340; Story on Agency, § 114; *Griswold* v. *Haven*, 25 N. Y. 595; *Van Leuren* v. *F. N. Bank*, 54 id. 671; *Pattison* v. *N. Bank*, 80 id. 82; *T. N. Bank* v. *Boyd*, 22 Am. Rep. 35.) The bonds having been left with the bank as collateral security for the payment of a note, and after the payment of the note not delivered to the plaintiff upon demand, is *prima facie* evidence of conversion, and the bank cannot excuse itself without showing affirmatively what had become of them, or some good ground for not returning them; the burden of exculpation is upon the bank. (*Caldwell* v. *N. M. V. Bank*, 64 Barb. 346; *Pattison* v. *S. N. Bank*, 80 N. Y. 98; Schouler on Bailments, § 23; *Collins* v. *Bennett*, 46 N. Y. 490; *F. N. Bank* v. *Zent*, 39 Ohio St. 105; *Cutting* v. *Malor*, 78 N. Y. 454; *L. C. N. Bank* v. *Smith*, 62 Penn. 47; Story on Bailments, § 339.) The defendant did not exercise even ordinary care in keeping the bonds. (*Caldwell* v. *M. Bank*, 64 Barb. 333.)

RUGER, Ch. J. Many of the questions involved in this case are authoritatively decided in the case of *Pattison* v. *Syracuse National Bank* (80 N. Y. 82). It is there held that national as well as state banks have authority to receive bonds and other securities, gratuitously and otherwise, for safe keeping and general banking purposes, from third persons, as a customary and usual incident of the business of banking, and that where the proof shows that the cashier has been accustomed, with the knowledge of the directors of the bank, to receive such deposits, it is a question of fact for the jury to determine whether he did so on behalf of the bank or as an individual. It is also plainly inferable from that case, that private instructions given to the cashier by other officers of the bank in relation to deposits, which are not communi-

cated to depositors, do not constitute any limitation upon the liability of the bank in case a loss occurs. (See, also, *Caldwell* v. *N. M. V. Bk.* 64 Barb. 333.) It was further held therein that a bank is chargeable for the loss of securities, gratuitously kept, for gross negligence alone, and that, having lawfully received securities on deposit, it was bound either to return them when called for, or show some sufficient ground for not doing so.

It is obvious that a bailee, whatever the character of the bailment may be, when its purpose has been fully satisfied and performed, is bound, upon request, to re-deliver the thing bailed to its lawful owner. This is necessarily implied, in all cases, from the nature of the contract of bailment. The authorities are uniform to the effect that such re-delivery may be excused in the case of a bailment, mutually beneficial to the parties, by proof that the deposit has been lost or destroyed without negligence, or want of such care on the part of a bailee as prudent men, under similiar circumstances, commonly take of their own goods. In the case of gratuitous bailments however, the bailee is liable only when chargeable with gross neglect. (Edwards on Law of Bailment, p. 7, *et seq*; Jones on Bailments, 23.)

It necessarily follows, from the nature of the obligation and the refusal to return the property, that the burden of showing the circumstances of the loss rests upon the bailee, and, unless the evidence shows the exercise of due care by him according to the nature of the bailment, he will be held responsible for the breach of his contract to return the property bailed. (*Patterson* v. *Syracuse Natl. Bk.*, *supra*; *Caldwell* v. *Mohawk Bk. supra*; *Collins* v. *Bennett*, 46 N. Y. 490; *Cutting* v. *Mahlor*, 78 N. Y. 454; *Russell Mfg. Co.* v. *N. H. Steamboat Co.*, 50 N. Y. 121)

The sufficiency of the evidence to establish the exercise of proper care will, generally, be a question of fact for the jury to determine upon all of the circumstances of the case, and the question here presented is, whether, under the circumstances proved, the jury was warranted in finding that the defendant.

was negligent in exercising the degree of care required for the safe keeping of the bonds in question. The proof showed that the plaintiff was a merchant residing at Troy and a regular customer of the bank and in March, 1883, left his bonds with the bank as collateral security for discounts made, and to be made, for him by such bank upon notes signed by him alone, and that they were never returned or offered to be returned to him by the bank. Discounts and renewals upon the security of such bonds were obtained by the plaintiff from time to time, extending over a period of nearly four years, when the last discounted note held by the bank was paid by an agent of the plaintiff. Upon that occasion the cashier voluntarily delivered to the agent a receipt signed by him, as cashier, acknowledging that the bonds had been received by the bank as collateral security for discounts made by it to plaintiff and that all such loans having been paid, the bonds were retained for future like use or safe keeping, subject to the plaintiff's order. Thereafter, as theretofore, the bank continued to pay the coupons falling due on the bonds to the plaintiff until October, 1887. In February, 1888, the plaintiff demanded the return of the bonds and was informed that they could not be found; but no information was afforded him in respect to the circumstances attending their disappearance or the mode by which they had been removed, if at all, from the possession of the bank.

Upon the trial the defendant gave evidence tending to show that it was the custom of the bank to return securities, held as collateral, to the owner upon payment of loans; but that while they were so held they were kept, with other valuable securities belonging to the bank, in a steel box inclosed in an iron safe, which was inclosed in a vault. The iron safe, as well as the steel box, had combination locks and the combination upon the steel box was known to the president and cashier alone, and the cashier alone had a key thereto. There was evidence also given to the effect that the cashier had been in the employ of the bank for many years and was a man of good reputation, until December, 1887, when he was removed from his position

for the alleged reason that he was a defaulter. Neither the
circumstances nor the character of the defalcation was shown.
All the bank officers, except the cashier, testified that they had
no knowledge of the possession by the bank of the bonds in
question or the place where they were kept after the loans
were paid, and that they, respectively, had not abstracted them
from the bank.

The by-laws of the bank provided for the appointment by
its president, once at least in every three months, of a commit-
tee consisting of two members of the board, who, together
with the president and cashier, should constitute a committee
of examination, and who were required to examine all matters
" pertaining to the affairs of the institution " and report the
same to the board. In actual practice, examinations were
made only once in six months instead of three, and by three
examiners instead of two. The examinations were, in fact,
confined to the securities owned by the bank, and such as it
held as collateral for unpaid loans; but the reports showed no
account of such collaterals or of special deposits. The bank
was accustomed to receive special deposits for safe keeping
from its customers, which were usually kept in the vault, but
no entry thereof was made on the books of the bank, and
no subsequent examination, inspection or report in relation
thereto was ever made, or provided for through the by-laws,
except as hereinbefore stated. Examinations of the affairs of
the bank were also annually made by a government inspector,
but they related only to the loans, discounts, revenues and
property of the bank, and did not include an inspection of its
special deposits or unreturned collaterals. No evidence was
given tending to show the cause of the abstraction or disap-
pearance of the plaintiff's bonds, except that inferable from
the circumstances above enumerated.

We are of opinion that the bank, under the circumstances
of this case, was not a gratuitous bailee of the bonds, and was,
in any view, liable for the want of ordinary and reasonable
care and diligence in their custody. The bonds came into
its hands in the usual course of business as collateral security

for loans to a customer, and it had never relieved itself of the liability thereby incurred by returning, or offering to return, them to their owner. On the contrary, it agreed, through its proper financial agent, to continue as their custodian for the purposes for which they had theretofore been employed. The making of such a contract was clearly within the power of the officer charged with the duty of negotiating loans and discounts, as one of the necessary incidents of the business he was employed to perform. The extension of lines of discount and credit to persons engaged in business upon stipulated securities, is one of the most common features of banking, and it must often happen that such loans are from time to time wholly or partially paid and satisfied. But we think this fact would not change the character of the liability of the bank in respect to the safe keeping of such securities. Intervals of days, weeks and months may frequently elapse between discounts, and it would be quite absurd to hold that during these periods the bank occupied any other relation to its customer than that of custodian of his bonds for purposes deemed mutually beneficial to both parties. The arrangement contemplated a course of business which was to continue for an indefinite period, and the notion that the bank was responsible for the safe keeping of the customer's securities so long only as particular loans were running, is founded upon too narrow a view of the obligation of the bank. The contract, under which the bank held the bonds, extended from the time of their reception until they were finally returned to the depositor, and its liability remained unchanged so long as the contract was in force. This contract enured to the mutual benefit of the parties, as it afforded the depositor ready facilities for raising money, and to the bank the profits of the business, the retention of its customer, and adequate security from loss in the transaction of its business.

Having arrived at the conclusion that the bank was not a gratuitous bailee, but received a compensation for the bailment, it follows that it was chargeable with the exercise of a high degree of care in their keeping.

It is not important in this case to consider with critical accuracy the difference between the various degrees of care required as to the several kinds of bailments, inasmuch as the evidence authorized the jury to find that the defendant omitted the exercise, not only of a high degree of care, but also of that denominated ordinary or reasonable care. The test of what is regarded as gross negligence or a want of the highest degree of care, by a bailee, as stated in the case of *Foster* v. *Essex Bank* (17 Mass. 499), a leading case in this country upon the doctrine of the non-liability of banks to special depositors, is "that degree of care which is necessary to avoid the imputation of bad faith, is measured by the carefulness which the depositary uses towards his own property of a similar kind." Ordinary neglect is said in the same case to be, according to Sir William Jones, "such as would not be suffered by men of common prudence or discretion."

While it is held in this state that the fact that the bailee's property is also stolen at the same time as that of the bailor, does not furnish conclusive evidence of the exercise of ordinary care (*Patterson* v. *Syracuse Bank*), yet it is the uniform doctrine of the cases that evidence of a want of such care as the bailee generally bestows upon his own property is strong and persuasive evidence of negligence on his part with respect to the property bailed. We have been unable to discover in the evidence before us proof of the exercise of reasonable care by the bailee in the custody and keeping of the bonds after the loans were discharged. Wherever they might have been kept while the loans were pending, or whoever might then have been charged with their custody, after that time, no effort or precaution seems to have been adopted by the bank to identify and protect the property from misappropriation by its officers and clerks. So far as appears, any or all of the employes of the bank could at any time have abstracted what the bank termed special deposits, and would have been practically safe from discovery or detection, except by accident or chance, for an indefinite period of time. A course of business affording such opportunities to fallible guardians, presents

an irresistible temptation to use the property under their control for illegal purposes, and usually results in the loss of the securities thus exposed. (*First Nat. Bank* v. *Ocean Nat. Bank*, 60 N. Y. 278.) While the bank protected its own property from loss or embezzlement through its employes by entries in its books as to its amount and character, and by frequent examinations ascertained its safety and condition, no such precautions were taken with reference to the property of customers left in its possession. No precaution whatever, either by keeping a record of such securities and thus facilitating the tracing and recovery of them in case of loss, or examinations, inspections or inquiry in relation thereto, were resorted to or provided for by the defendant, but they were left exposed wholly to the self-restraint and unguarded control of those having opportunity to take them. (*Caldwell* v. *Mohawk Nat. Bank, supra.*)

The claim that immediately upon the payment of the loans, for whose security the bonds were held, the bank could abandon their possession to the officer receiving payment thereof without incurring liability to their owner, is too fallacious to need serious refutation. We think the case fails to show the exercise of reasonable care by the bank in the keeping of these bonds. A board of directors which leaves the custody, control and management of its securities and property to a single officer, no matter how high may be his character and reputation, for a long space of time without supervision, examination or inquiry, is justly subject to the charge of negligence in the performance of its duty. It is said in Morse on Banking (p. 77), as to the duty of directors of banks, that they "are bound to constant activity and thorough acquaintance with the daily course of the affairs and dealings of the institution. It is their duty to make this acquaintance so thorough that no officer can continue long and consistently to usurp a function of any degree of importance whatever without their knowledge." It is further said on page eighty-four, in relation to the duty of a board of directors in supervising the conduct of the officers of a bank, that if such officers had borne bad character, or had circumstances of sus-

picion or demanding inquiry come to the knowledge of the board, or had the board for any reason been unwilling to trust their own property with them in the same manner in which they trusted the property of the bank, a case might have been made for holding the bank liable for a loss occuring to a special depositor.

It was said by the late Chief Judge CHURCH in *Cutting* v. *Mahlor* (78 N. Y. 460), that " a corporation is represented by its trustees and managers; their acts are its acts, and their neglect its neglect. The employment of agents of good character does not discharge their whole duty. It is misconduct not to do this, but in addition they are required to exercise such supervision and vigilance as a discreet person would exercise over his own affairs. The bank might not be liable for a single act of fraud or crime on the part of an officer or agent, while it would be for a continuous course of fraudulent practice. * * * Here were no supervision, no meetings, no examination, no inquiry. * * * A system of management of a banking-house, in which such conduct of its officers was permitted, was a breach of duty and grossly negligent towards its dealers, and persons having stocks and bonds in its keeping."

This language is peculiarly applicable to this case and correctly states the rule by which the evidence for the defense should be considered. That evidence utterly fails to show the exercise of that degree of care which it bestowed upon its own property, or the circumstances attending the loss of the bonds, from which such care might be inferred, and fully supports the verdict of the jury. The defaulting cashier was not called to explain their disappearance or to state whether he took them or not, and no explanation was given why he was not so called. He was the agent whom the bank had employed as the custodian of its funds and represented it in its transactions with the public and, in the absence of other sufficient evidence of their loss, we think it was the duty of the bank, if it was able to do so, to produce this witness for examination on the trial, and, in the absence of such testi-

mony, the jury might well have found that the defendant had not sufficiently shown that the bonds were lost without neglect on its part. The evidence was insufficient to establish as a proposition of law that the cashier had stolen the bonds or that they were appropriated by him, and it was a possible explanation or solution of their non-delivery, that they had been inadvertently mislaid or delivered to another depositor by some officer of the bank or were used by the cashier in the business of the bank, or appropriated by the defaulting cashier after his misconduct had been discovered.

We think the charge of the court was not justly subject to criticism in respect to remarks made relative to the degree of care required of the bank to relieve itself from liability to the plaintiffs.

Under the principles governing the case hereinbefore laid down, the bank was liable for an omission to exercise ordinary and reasonable care in protecting the property of its customers, and such care, we think, excludes the commission of any act of negligence by the bailee.

In pursuance of these views the judgments of the courts below should be affirmed.

All concur,. GRAY, J., in result.

Judgment affirmed.