ARTHUR ALBERS, Plaintiff, *v.* CREDIT SUISSE, Defendant.

City Court of the City of New York, Trial Term, New York County,
October 10, 1946.

*Alfred A. Rosen* for plaintiff.

*Thomas P. Farley* and *Harry H. Mitchell* for defendant.

COLEMAN, J.   Plaintiff sues the defendant bank for its failure to return to him certain bonds which he had entrusted to it for safekeeping.   The defendant denying liability, relies upon a letter signed by the plaintiff directing it to transfer the bonds to the account of a third party.   The plaintiff seeks to avoid the effect of this letter by asserting that it was signed by him in circumstances which made it a nullity; that the defendant knew those circumstances, acted in disregard of them, and thereby acted in disregard of its obligations to him.

Plaintiff was a Viennese merchant. In 1937 he deposited with the defendant bank in Switzerland for safekeeping five $1,000 Yugoslavian Government bonds. In March, 1938, the German Government occupied Austria and incorporated it within the German Reich. In September of that year the plaintiff, because of his religion, was removed to a concentration camp where he remained until April, 1939. In this period, and from time to time he signed papers and documents as they were submitted to him by his captors; he had no choice, of course. He signed the letter in question without knowing its contents and without being permitted to read it, although there were times when depending upon the whim of the functionary of the moment he was allowed to look over papers that he was signing. He did not sign the letter as a condition of release from the concentration camp. The letter is dated September, 1938, and January 6, 1939; it was received by the defendant January 14, 1939. It was typed upon stationery of plaintiff's business, but plaintiff had nothing to do with its preparation; he had long been removed from his place of business and all his effects had been confiscated. The letter directed the defendant to transfer $10,000 Yugoslav bonds [*sic*] from his account to the account of Oesterreichische Credit Anstalt, a banking institution in Vienna. The letter was received by the defendant in Zurich not from the plaintiff but from the Viennese bank. That bank, in enclosing the plaintiff's letter, asked the defendant to transfer the bonds in accordance with the letter and to sell them for its account. The defendant followed these instructions.

In June, 1938, a distant relation of plaintiff, wrote to a resident of Zurich, one Fleischman, describing the situation of the plaintiff. He stated in his letter that plaintiff was " in protective custody "; that he would be released only if he were to relinquish his property in favor of the State and that he had already done so. He went on to say that the bonds deposited with the defendant constituted plaintiff's entire property and he requested that the defendant be asked to deliver the bonds only to the plaintiff in Zurich; that if the plaintiff's firm were to ask for the bonds the request should be denied as the firm was no longer his. A copy of this letter was sent to the defendant which, through an employee, Kollreuther, on June 18th, acknowledged its receipt and stated " in accordance with the request I had an instruction entered for the said deposit in accordance with which the deposit is to remain blocked and in case of any possible dispositions an inquiry must first be submitted to me. Should such a case occur I shall be very willing

to get in touch with you again ". An appropriate notation was in fact made upon the bank's records.

When the plaintiff's letter instructing the defendant to transfer the bonds to the Viennese bank was received with the latter's request, the defendant, by the same employee, did get in touch with Fleischman, but the result of his so doing is obscure. Kollreuther testified that although he communicated with Fleischman, " I did not have to receive any instructions from the Fleischman firm and I have also not received any instructions as it had no power of attorney ". Apparently nothing transpired, and the defendant without more, and without further inquiry, made the transfer. It then wrote the plaintiff that pursuant to his instructions it was transferring the bonds to the account of the Viennese bank; it called plaintiff's attention to· the fact that there were only five bonds in his account, not ten. This letter was not received by the plaintiff until long after this transaction; indeed, as will be explained later, it could not be received by him. After plaintiff was released from the concentration camp he·made his way to London, arriving there late in 1939; he then wrote the defendant for the bonds. The bank replied, in November, 1939, that the bonds had been sold pursuant to his instructions and it sent him a copy of the letter it had " written " him the previous January.

The test of the plaintiff's right to recover and of the defendant's liability is whether the defendant acted prudently and in good faith with relation to the securities entrusted to it for safekeeping. For there is no doubt that when the defendant received the bonds for safekeeping and for compensation it became a bailee and its liability is to be determined by reference to the manner in. which it discharged the obligations which it assumed as bailee. (*Ouderkirk* v. *Central National Bank,* 119 N. Y. 263, 270; *Pattison* v. *Syracuse National Bank,* 80 N. Y. 82; *Manhattan Bank of Memphis* v. *Walker,* 130 U. S. 267; *National Bank* v. *Graham,* 100 U. S. 699.) The plaintiff takes the position, as I have said, that as a matter of fact the bank acted in total disregard of the instructions it had .received in June, 1938, to ignore any letter of his purporting to transfer the bonds, and in disregard of its obligations to him; that it assumed an attitude of complacency in the face of specific information which it had concerning the plaintiff's circumstances and of general information which it shared with banking institutions in Europe for a number of years preceding the outbreak of war. As the trier of the facts called upon to determine the facts and to exercise judgment upon them, I agree

with the plaintiff's position and I find in his favor. I append an exposition of my views as the trier of the facts.

The plaintiff's letter authorizing the transfer was, of course, void considering the circumstances in which it was signed. But if that were all before the defendant it could act upon the letter with impunity; it would be putting too strict an obligation upon it, too onerous a burden, to ask it to go behind every letter of authorization that it received. But if it knew the circumstances in which the letter was written it could not rely upon it without being remiss in the duty it owed the plaintiff; and it did know those circumstances. It knew the general state of affairs in Germany and in the adjacent countries that had been forcibly seized by the German Government. It knew of the destruction of life, of the torture and the confiscation of property visited upon numberless people for no reason other than their religion. It knew that the plaintiff was one of those persons. The letter which it had received in June of 1938 through an intermediary of the plaintiff informed it precisely of the plaintiff's status. It had no communication from the plaintiff, or from anyone acting in his behalf, from June, 1938, until it received the letter of January, 1939. If the plaintiff had died in the intervening period, of course, defendant could not rely on the letter. The fact that it made no inquiry concerning his whereabouts or his existence, is an indication of its intention to rely only upon the formalism of the letter and to ignore all other circumstances.

When the bonds were deposited with the defendant, the plaintiff had received a " certificate of deposit ". Under the regulations governing the deposit, the " certificates " were not transferable and were to be delivered to the bank in case of withdrawal of the bonds. The bank was authorized to surrender the bonds to any bearer of the certificate. It agreed " before making the delivery " to " identify the qualifications of the party receiving same as far as possible, without, however, undertaking any obligation in this connection. If any deposit certificates are missing or, if they cannot be submitted for special reasons, the Credit Suisse may also be satisfied, upon withdrawal of the entire deposit, with a receipt and a written declaration [which declaration is not subject to any further special formalities] stating that the deposit certificates are null and void, signed by the depositor or the heirs of same." No certificate accompanied the instructions to transfer the bonds, and the plaintiff's letter did not account for its nonproduction. But the defendant neither asked for its production

nor did it make any inquiry as to the reason for not producing it, either of the plaintiff or of the Viennese bank. In the face of what it knew of the plaintiff's status — although it is true that there may have been cases where it could act without receiving the certificate — its inertness in this instance is the equivalent of laxness and carelessness. The plaintiff's letter, it will be recalled, spoke of ten bonds. There were in fact only five; yet the defendant did not ask the plaintiff for an explanation; it simply disposed of all the bonds in its possession.

There is yet another telling circumstance against the defendant's position: Upon receiving the plaintiff's letter authorizing the transfer, it wrote to him, as I have said, acknowledging the receipt of his instructions and advising him that it had complied with them. This letter, however, was not mailed to the plaintiff at his last known address in Vienna. It was not even addressed to him there. It was addressed to him in care of the defendant and deposited in its own files. Nor was this an isolated instance. It was the practice of the bank to keep in its own files letters which it addressed to depositors, customers and others with whom it transacted business who resided in territory under German control and with whom it was aware that it was imprudent to communicate directly. It went through the motions of " communicating " with such persons, by preparing letters addressed to them and placing the letters in their own files.

The defendant cannot escape the implication of its conduct — that it knew the plaintiff was one of those persons who was not free to communicate with it, who was not free to use the mails for the conduct of his personal affairs or business affairs, and that it was useless for it to attempt to communicate with him. And above all it knew that the plaintiff was not likely of his free will to transfer property of his located in Switzerland to a bank in German territory controlled by the German Government. Its suggestion that it adopted this peculiar method of " correspondence " as a measure of protection to those who were enmeshed in the lawless acts of the German Government can hardly help its position. It says that it desired to keep its dealings with such persons secret from the German Government. Yet if plaintiff's letter represented his will, there was no need for secrecy. There was no reason not to address the plaintiff in Vienna, nor was it necessary as a matter of protection to him to conceal from the German authorities what it had done at the plaintiff's request and the request of the Viennese bank itself. It certainly could do the plaintiff no harm if

he had been informed directly. If proof were necessary to show the bank's knowledge of the fact that the plaintiff was an automaton who was merely registering the will of a superior force and not his own when he signed the letter it lies in its course of " correspondence " and its justification of it.

I cannot overlook the fact that the plaintiff did indeed obtain his release from the concentration camp, and that he was ultimately permitted to leave German territory; and if the defendant's act in transferring his property contributed to his release, the plaintiff might well be content with the result. Indeed, the defendant suggests — here taking a contradictory position — that even though it may have known all the facts it nevertheless saved the plaintiff " vexation " by making the transfer and it is thereby exonerated. But can one say the plaintiff is alive and in this country because the defendant followed his " instructions "?

At this distance in time and place from a Europe on the eve of an impending catastrophe it is impossible to say what motivated the defendant in disregarding the plaintiff's instructions. It may be that the defendant believed it was acting in plaintiff's best interest when it did what it did do — to save him further torture and outrage — and ultimately to save him his life. But, on the other side — if I accept testimony that I rejected at the trial * — that two banks in countries noncontiguous to Germany which received similar letters from the plaintiff written in similar circumstances, ignored those letters — there is the fact that the plaintiff received his freedom without giving up all his possessions and there is no means of knowing why he was permitted to leave Germany. The pattern that emerges from the facts in this respect is too obscure and does not prevent the application of the basic rule of law.

The bank was the steward of the plaintiff's property. Its stewardship required it to act in a prudent manner and in good faith. The evidence satisfies me that it did neither, that it relied only upon the terms of the letter in reckless disregard of everything it knew bearing on the circumstances of the letter. It was not free to do so.

There are a few questions of law raised by the defendant which I have not yet considered as I think they are without merit and their statement earlier in the opinion would have caused a

* There is no reason why I should not accept this testimony to offset the inference suggested by the defendant of the ultimate and fortuitous wisdom of its act; I could not accept it as tending to set up a standard of care for the defendant — the ground upon which the plaintiff offered it.

digression from the discussion of what I believe to be the dominant facts. The "agreement of deposit" under which the defendant received the bonds contained the clause that "for the signature binding the Credit Suisse, * * * there are always required the signatures of two officials authorized for this purpose." The letter of the defendant which acknowledged receipt of the letter from plaintiff's relation and which stated "the deposit is to remain blocked" was signed by one individual only, Kollreuther, and the defendant urges that this employee alone had no authority to make any agreement in behalf of the bank. But the answers are obvious. The references to "two signatures" is contained in a footnote under the clause dealing with the issuance of certificates or receipts for articles received for safekeeping and simply calls attention to the fact that receipts must contain the signatures of two officials. As I have said, no receipt was delivered to the defendant by the plaintiff or by the Austrian bank when the defendant transferred the bonds; nor did the defendant ask the whereabouts of the receipt. It acted upon the plaintiff's letter alone; and it now defends on that basis. But the question is not as to the authority of the bank's employee to make an agreement but whether he can be considered an agent to receive notice or information. The issue here is whether the bank exercised the proper degree of care in the light of knowledge which it had. Kollreuther had charge of the plaintiff's account and other similar accounts, and the bank's records relating to them; and his receipt of the letter describing the plaintiff's condition was the bank's; the information contained in it was information to the bank. Kollreuther was examined on interrogatories in Switzerland, on behalf of the bank and as its representative for the purposes of this litigation and at no time in the course of his examination did the defendant raise the question of his "authority".

The defendant also argues that the letter itself did not come from the plaintiff but was second- or third-hand and so hearsay and not a direct statement of fact; but the defendant, by Kollreuther, accepted the contents of the letter as a statement of fact.

The defendant suggests but does not press the point that the internal substantive law of Switzerland governs and should determine the question of liability. (Cf. *Russell* v. *Societe Anonyme*, 268 N. Y. 173.) But neither side offered any testimony on the Swiss Law. And in the absence of such testimony and notwithstanding section 344-a of the Civil Practice Act the

case is of the kind which should be decided by reference to our own rules as it is one arising out of customary banking practice as to custody accounts. (*Cf. Arams* v. *Arams,* 182 Misc. 328.)

There is no merit to the contention — based on the provision in the deposit agreement that any suit arising under it must be brought in Switzerland — that our courts cannot hear and determine the controversy between the litigants. (6 Williston on Contracts [Rev. ed.], § 1725; *De Gorter* v. *Banque de France,* 176 Misc. 1062, affd. 262 App. Div. 997; *Wood & Selick* v. *Compagnie Generale Transatlantique,* 43 F. 2d 941.)

It was agreed that if the plaintiff is entitled to recover, the recovery should be $1,150 and there will be judgment for the plaintiff in that amount, with interest.