G. K. YOUNG *v.* FIRST NAT. BANK OF ONEIDA.*

(*Knoxville.* September Term, 1924.)

1. **WAREHOUSEMEN.** Relation of bailor and bailee arises on lease of safe deposit box.

Relationship between national bank and renter of safe deposit box installed in bank's vault *held* to be that of bailor and bailee. (*Post, pp.* 461-463.)

Cases cited and approved: Chicago, etc., R. Co. v. Scott, 42 Ill., 132; Sawyer v. Old Lowell Nat. Bank, 230 Mass., 342; Pennington v. Farmers' & Merchants' Bank, 144 Tenn., 188.

Cases cited and distinguished: National Safe Deposit Co. v. Stead, 250 Ill., 593; Mayer v. Brensinger, 180 Ill., 110.

2. **WAREHOUSEMEN.** Facts held not to show bank's lack of ordinary care in safe-guarding safe deposit box.

Proof that country bank, which did not represent or advertise that its safe deposit boxes were burglar proof, did not employ night watchman, only kept electric lights burning in bank until approximately eleven o'clock p. m., did not equip building with burglar alarm, and deposited its own securities in screw door steel safe, *held* not to show lack of ordinary care to protect complainant's bonds deposited in safe deposit box from burglary; "safe deposit box" being trade-name. (*Post, pp.* 463-467.)

Cases cited and approved: Cussen v. So. Cal. Savings Bank, 133 Cal., 534; Perera v. Panama Pacific Int. Exp. Co., 179 Cal., 63; Copelin v. Berlin Dye Works, etc., Co., 168 Cal., 715; Chilberg v. Standard Furn. Co., 63 Wash., 414; Ketterer v. Armour & Co., 247 F., 921; Battelle v. Mercantile Warehouse Co., 139 App. Div., 649;

---

*On acceptance of receptacle as charging one as bailee of contents, see note in 1 A. L. R., 272; 18 A. L. R., 87.

On liability of bank for loss of liberty bonds, see note in 17 A. L. R., 1217.

Jones v. Hatchett & Bro., 14 Ala., 743; Bertha Zinc Co. v. Martin's Adm'r, 93 Va., 791; Pioneer Fire Proof Const. Co. v. Caroline Sandberg, Adm'x, etc., 98 Ill. App., 36; Burns v. Sennett & Miller, 99 Cal., 363; Hennessey v. Bingham, 125 Cal., 627; Longuy v. La Société Française, 52 Cal. App., 370.

Case cited and distinguished: Webber v. Bank of Tracy, 225 Pac. 41.

*Headnotes 1.   Warehousemen, 40 Cyc, p. 402;   2.   Warehousemen, 40 Cyc, p. 478.

---

FROM SCOTT.

---

Appeal from the Chancery Court of Scott County to the Court of Civil Appeals, and by *certiorari* to the Court of Civil Appeals from the Supreme Court.—HON. H. E. PORTRUM, Chancellor.

DAVIS & DAVIS, and HAGGARD, JENNINGS, WRIGHT & BURN, for appellant.

SMITH, WORD & ANDERSON, for appellees.

MR. JUSTICE HALL delivered the opinion of the Court.

The bill in this cause was filed by G. K. Young against the First National Bank of Oneida to recover the value of eight United States bonds, of the denomination of $50 each and accrued interest.

The defendant answered the bill and denied liability.

Proof was taken, and the cause was heard by the chancellor, who was of the opinion that complainant was entitled to the relief sought, and entered a decree in his favor and against defendant for the sum of $506.45, the value of the bonds and accrued interest.

From this decree defendant appealed to the court of civil appeals. That court reversed the decree of the chancellor and dismissed complainant's bill. The cause is now before this court upon a writ of *certiorari* for review.

The material facts, briefly stated, are as follows: Defendant, First National Bank of Oneida, is a national bank and is engaged in the banking business at Oneida, Tenn. Its capital stock is $25,000, and its total resources is $500,000. The town of Oneida is in Scott county, and is located on the main line of the Cincinnati, New Orleans & Texas Pacific Railway Company. Its population is about one thousand inhabitants. At the time of the happening of the things hereinafter to be stated, defendant bank did business in a frame building consisting of two rooms, the main banking room and the directors' room. A partition wall separated the main banking room from the directors' room. There was a door in the partition wall, through which egress and ingress was had from one room to the other. The directors' room was in the rear of the main banking room. There were windows in the rear wall of the directors' room.

The vault of the bank was in the main banking room. It was constructed of brick; the walls being about eighteen inches thick. There was an air chamber in between the lap of the brick. The door to the vault was made of steel, and was manufactured by the Hall Safe Company, of Cincinnati, Ohio, and was of the thickness usual to doors of vaults like that of defendant. As a part of its business, defendant installed and placed in its vault a cabinet, or, as some of the witnesses describe it, a nest of "safe deposit boxes." Defendant advertised on its

stationery that it had safe deposit boxes for rent. The cabinet or nest contained twenty-six boxes. The walls of the cabinet were of steel, and the boxes were possibly made of tin, or a similar substance, and painted. The cabinet and the boxes were such as were, at the time, usually installed and kept for rent by banks like defendant located in towns of the size of Oneida. The boxes were of three sizes. The medium size boxes rented for $1.50 per year. When the boxes were installed, defendant made known the fact to its patrons and the public that it had them for rent, and complainant rented one of the medium size boxes, for which he paid defendant $1.50 per year. This was several years before the occurrence hereinafter to be narrated.

During the World War defendant bank, acting as the agent of one of the Federal Reserve Banks, without profit or compensation to it, and acting wholly from patriotic motives, sold Liberty bonds to its patrons and others. Among others, it sold complainant eight Liberty bonds, of the face value of $50 each.

Defendant did not advertise that its vault or its safe deposit boxes were burglar proof. It was its custom, however, to warn or advise lessees of said boxes not to put negotiable securities in them, but the proof fails to show that complainant was given such warning by any officer of the bank at the time he rented the box in question. Complainant placed said eight bonds in his safe deposit box so rented from defendant. It does not appear that defendant's attention was called to the fact of the putting of the bonds in the box by complainant, or that it, at the time, knew of complainant putting the bonds in said box; but it does appear that it thereafter

became cognizant of the fact that the bonds were being kept by complainant in said box. Defendant did not advise complainant to continue keeping the bonds in the box, nor did it suggest that he remove them. Certain officials of defendant also kept valuable papers, including United States bonds, in certain of the safe deposit boxes of the bank. Some of the bonds kept in the boxes by officials of the bank, and others, were registered, and some were not. Complainant's bonds were not registered.

Neither the town of Oneida nor the defendant employed or kept a night watchman. The proof shows that a night watchman would have cost the bank, had it employed one, from $75 to $100 per month. There was only one peace officer in the town of Oneida, and he slept within less than sixty-five yards of the bank building. There was an electric light plant in Oneida. It was sometimes operated throughout the entire night, but was generally closed down about eleven p. m. Electric lights were installed in the bank building, and were kept burning at night as long as the plant was operated. Defendant's bank building was not equipped with a burglar alarm. At the time, it was not customary for banks of the size of defendant, in towns similar to Oneida, to have burglar alarms, or to employ night watchmen. Defendant maintained in its vault what is sometimes called a screw door steel safe, almost round, with a circular shaped compartment on the inside, which was about eighteen inches in diameter. Defendant kept its cash, notes, negotiable bonds, and the like in said safe. Defendant's bank building, vault, and safe deposit boxes were as strong and as nearly safe against burglars as were the buildings, vaults,

and safe deposit boxes of other banks the size of defendant bank and located in towns the size of Oneida.

The record does not show complainant's age, but does show that he is a man of intelligence. He is a traveling salesman, and has been for a number of years. He is, and was before the loss of his bonds, accustomed to doing business with banks. He was mayor of the town of Oneida, and had served in this capacity for three years.

On the night of May 16, 1920, burglars prized up a window in the rear of said bank building, entered the rear room, then prized open the door leading from the directors' room into the main banking room, which door was locked, entered the main banking room, and, with crowbars, spike pullers, hammers, and perhaps other tools, purloined from a nearby railroad section house, entered the vault, broke open complainant's safe deposit box, and a number of others, and, among other things, took complainant's said eight bonds. The burglars also took from some of the other safe deposit boxes bonds and other valuables belonging to other persons, including certain officials of the bank.

It should be stated that it was the custom of the bank to turn over to the person renting a safe deposit box a key to said box. The bank retained a key known as the master key. In order to unlock a safe deposit box, it was essential that the master key be inserted and turned, then one of the individual keys inserted and turned, and then the box unlocked. It therefore appears that a box could not be unlocked without the joint consent of the bank and the lessee of the box, for before the lessee could unlock the box he would have to procure an employee of the bank to use the master key as stated, or he would have to procure the master key from the bank and

use it himself. The bank could not unlock the box without the use of the individual key in connection with the master key. If a patron desired, the bank would retain one of the individual keys for the convenience of the patron, and would turn it over to him when called for. With the consent of complainant in this cause, the defendant bank retained one of his individual keys.

Upon the foregoing facts it is insisted by complainant that he is entitled to recover of the bank for the loss of his bonds, and that the court of civil appeals committed error in reversing the decree of the chancellor and dismissing his bill, with costs.

We are of the opinion that the relationship which existed between complainant and defendant bank was that of bailor and bailee, and that their rights must be determined in accordance with the rules of law governing that relationship.

In *National Safe Deposit Co.* v. *Stead*, 250 Ill., 593, 95 N. E., 977, Ann. Cas., 1912B, 434, the court said:

"We think it clear that, where a safety deposit company leases a safety deposit box or safe, and the lessee takes possession of the box or safe and places therein his securities or other valuables, the relation of bailee and bailor is created between the parties to the transaction as to such securities or other valuables, and that the fact that the safety deposit company does not know, and that it is not expected it shall know, the character or description of the property which is deposited in such safety deposit box or safe does not change that relation any more than the relation of a bailee who should receive for safe-keeping a trunk from a bailor would be changed by reason of the fact that the trunk was locked

and the key retained by the bailor, although the obliga-
tion resting upon the bailee with reference to the care
he should bestow upon the property in the trunk might
depend upon his knowledge of the contents of the trunk.
Obviously, the bailee would be in possession of the trunk
and its contents, and no amount of argument would dem-
onstrate that, while the trunk was in possession of the
bailee, its contents were in the possession of the bailor,
solely by reason of the fact that the bailor of the trunk
retained the key and the bailee did not have access to
the trunk. We are of the opinion that the relation of
bailee and bailor exists between the appellant and its
lessees, and that the deposit of the securities and valu-
ables by its lessees in rented safety deposit boxes or
safes is a bailment, and that the law applicable to bail-
ments generally, applies to such transaction and to such
property.

"In *Mayer* v. *Brensinger,* 180 Ill. 110, 54 N. E., 159,
72 Am. St. Rep., 196, the appellee rented from the ap-
pellant a safety deposit box in his safety deposit vault,
in which he deposited cash. During the illness of the
appellee the cash was removed from the box, and suit
was brought, and a recovery was had. In that case, as
in this, the appellee retained the key to the box. The
court, on page 113, said: 'The relation which the ap-
pellant bore to the appellee was that of a bailee or de-
positary for hire. As such bailee or depositary for hire
the appellant was bound to exercise ordinary care and
diligence in the preservation of the property intrusted
to him by the appellee. Ordinary care in such cases is
such care as every prudent man takes of his own goods,
and ordinary diligence in the preservation of such goods

is such diligence as men of common prudence usually exercise about their own affairs. *Chicago, etc., R. Co.* v. *Scott,* 42 Ill., 132. Although one who hires a box in the vaults of a safety deposit company may keep the key himself, yet the company, without any special contract to that effect, will be held to at least ordinary care in keeping the deposit.'"

To the same effect is the rule announced in *Sawyer* v. *Old Lowell Nat. Bank,* 230 Mass., 342, 119 N. E., 825, 1 A. L. R., 269, and annotations to said case beginning on page 272; *Pennington* v. *Farmers' & Merchants' Bank,* 144 Tenn., 188, 231 S. W., 545, 17 A. L. R., 1213.

We are of the opinion that the facts show that defendant exercised that degree of care and diligence required of it as such bailee for hire.

Defendant's banking house, vault, and safe deposit boxes were equal to those maintained by similar banks in towns of the size of Oneida. It did not advertise that its building, its vault, or its safe deposit boxes were burglar proof, and complainant does not claim that any such representation was made to him. The term "safe deposit box" is a trade-name. It was not used with a view to leading patrons to believe that such boxes were safe against attack by burglars, or that they became safe against such attacks when placed in vaults like that of defendant. We do not think the failure of defendant to warn complainant not to put his bonds in such box renders it liable. Defendant did not advertise or claim its vault to be burglar proof. The vault was not steel-lined, which fact complainant knew, or could have known by casual observation.

Defendant's officers testified that it was generally known in the community, or should have been known, that said building, vault, and boxes were not burglar proof. Complainant had every opportunity to inquire as to whether said agencies were burglar proof, or to make a personal examination thereof. The proof shows, and the average man well knows, that, in this day and time, few, if any, buildings and vaults, and, comparatively speaking, few safes, are burglar proof.

The only expert examined in the cause testified that he did not consider any equipment absolutely burglar proof.

It is said that the bank kept its own securities in the screw door safe. This is true. It was not asked to keep complainant's securities in the screw door safe. It did not agree to furnish complainant with equipment equal to the screw door safe in which to keep his valuables, and for the consideration of $1,50 per year it could hardly be expected to furnish equipment burglar proof or safe enough to justify a reasonably prudent person in believing that such equipment was burglar proof

This cause is clearly distinguishable from *Pennington* v. *Farmers' & Merchants' Bank,* supra. In that case the bank received a box from complainant containing bonds for the purpose of taking care of them. Mr. Pennington had rented no space or receptacle in the bank's vault, and the bank was free to keep his box where it deemed proper. In the present cause exactly the opposite is true. Complainant had rented a certain defined space in the vault of the bank. He could place in that space his property at his pleasure, and he could likewise at his pleasure remove it. Defendant bank had no control or supervis-

ion over what papers or property complainant should place in said box, and it was not free to keep the box in any place that it might choose to keep it. In the Pennington Case the president of the bank had agreed to receive and care for complainant's bonds, and complainant relied upon the promise of the president to do so. In the present cause there is no contention by complainant that the officers of defendant bank had given him any such assurances, or had entered into any such contract with him. In the Pennington Case complainant was not familiar with the interior of the bank's premises. In the present cause complainant was thoroughly familiar with the bank's premises, or should have known, as well as the bank's officers, that the vault of the bank was not burglar proof.

The very question we have under consideration was presented for decision to the district court of appeals of the First District of California in the case of *Webber* v. *Bank of Tracy* (Civ., 4626), 225 P., 41, on February 28, 1924; hearing denied by supreme court April 28, 1924. The facts in that case were very similar to the facts in the instant cause. The court in that case, discussing the legal principles involved, said:

"The relation between these parties was that of bailor and bailee. The defendant was a bailee for hire. It devolved upon defendant to use ordinary care in the safeguarding of plaintiff's property. *Cussen* v. *Southern California Savings Bank,* 133 Cal., 534, 65 P., 1099, 85 Am. St. Rep., 221. In the absence of any stipulation between the parties, the limit of a bailee's obligation is the exercise of ordinary care, and he cannot be said to be an insurer of the property against theft, if he has exer-

cised such care. *Perera* v. *Panama Pacific International Exposition Co.,* 179 Cal., 63, 175 P., 454; *Copelin* v. *Berlin Dye Works, etc., Co.,* 168 Cal., 715, 144 P., 961, L. R. A., 1915C, 712. In general it may be said that a bailee is required to exercise that degree of care which an ordinarily prudent person bestows upon his own property of a like description. The standard of ordinary care must, of necessity, vary with time and place, since what might be ordinary care at certain times and in certain localities might, at different times and at other places, amount to but slight care. The influence of custom and business must also be considered in determining what is ordinary care, as in certain businesses or trades disposition may be made of property or goods by a man of ordinary prudence which, under other circumstances, would certainly be open to the charge of gross negligence. Moreover, what would be the exercise of ordinary care with regard to articles of a certain kind might be far from such with regard to those of a different sort. When one is wanting in the exercise of ordinary care, he is said to be guilty of ordinary negligence.

"It would seem that the ordinary care required of a bank in a case like this is that the construction of the bank building and the methods of protection and the general conduct of its business should conform to those of banks in similar communities. *Chilberg* v. *Standard Furniture Co.,* 63 Wash., 414, 115 P., 837, 34 L. R. A. (N. S.), 1079; *Ketterer* v. *Armour & Co.,* 247 F., 921, 160 C. C. A., 111, L. R. A., 1918D, 798; *Battelle* v. *Mercantile Warehouse Co.,* 139 App. Div., 649, 124 N. Y. S., 135; *Jones* v. *Hatchett & Bro.,* 14 Ala., 743; *Bertha Zinc Co.* v. *Martin's Adm'r,* 93 Va., 791, 22 S. E., 869, 70 L. R. A.,

999; *Pioneer Fire Proof Construction Co.* v. *Caroline Sandberg, Adm'x etc.,* 98 Ill. App., 36; *Burns* v. *Sennett & Miller,* 99 Cal., 363, 33 P., 916; *Hennesey* v. *Bingham,* 125 Cal., 627, 58 P., 200; *Longuy* v. *La Société Française,* 52 Cal. App., 370, 198 P., 1011.''

We think the proof in the instant cause fails to show that there was a lack of ordinary care upon the part of defendant bank with respect to complainant's bonds, and that the court of civil appeals properly held that it was not liable, and dismissed complainant's bill, and its judgment is in all things affirmed, with costs.