FARRELL-CALHOUN CO., INC., for Use of AUTOMOBILE INS. CO. OF HARTFORD, CONN., v. UNION CHEVROLET CO. —113 S. W. (2d) 419.

Western Section. May 28, 1937.

Petition for Certiorari denied by Supreme Court, February 12, 1938.

Albert Johns and W. Curtis Pope, both of Memphis, for plaintiff in error.

Lowell W. Taylor, of Memphis, and H. M. Gregory, of Athens, for defendant in error.

KETCHUM, J. In this case the plaintiff, Farrell-Calhoun Company, Incorporated, brought the suit for the use and benefit of the Automobile Insurance Company of Hartford, Conn., against the defendant, Union Chevrolet Company, for damages in the sum of $375.24, sustained by the plaintiff by reason of the alleged negligence of the defendant in permitting the plaintiff's automobile to be stolen out of the defendant's repair shop, after it had been left there for certain repairs and services. To the plaintiff's declaration, the defendant filed a plea of ''not guilty.'' On a trial of the case before the court sitting without a jury, the plaintiff's suit was dismissed and its motion for a new trial having been overruled, it has appealed in error to this court.

The defendant had for ten years prior to June 8, 1932, been engaged in business in Memphis as a Chevrolet automobile dealer, and shortly before that date had sold to the plaintiff a new Chevrolet sedan for the sum of $720.50. The defendant's place of business was located at the corner of Union avenue and Camilla street, in the city of Memphis. In the rear part of its building, which extended northwardly to Monroe avenue, it maintained a service and repair department in which from 15 to 20 mechanics and repairmen were regularly employed, and in which from 50 to 75 cars were serviced or repaired per day. There was a shop foreman in charge of this repair department. It was his duty to see that the work on the cars was properly done, and that the cars were delivered, when the work was done,

to the owners. There were three wide doors in the side of this repair shop, opening on Camilla street. The lunch hour was between 12 and 1 o'clock, and the mechanics and repairmen generally went out to lunch at that time, but there were generally as many as 4 or 5 men working on cars in the repair shop during the noon hour.

One the morning of June 8, 1932, at about 10:30 o'clock Mr. Oral McGee, a salesman of the plaintiff, took the plaintiff's car to the defendant's place of business to have the 500-mile inspection, and to have the car greased and the oil changed; he talked to Mr. Richmond, the defendant's vice-president, who made out a bill showing the work to be done on the car, and gave a duplicate to McGee; Richmond then directed one of the men in the service department to take McGee up town to the plaintiff's place of business, which he did. The service man, Carroll, then took the car to the defendant's repair shop where it was serviced, and then parked inside of the repair shop along with the cars of other customers, with the ignition key in the lock. The car was delivered at the repair shop at about 11 o'clock. At about 1 o'clock, McGee telephoned to Richmond and asked to have the car sent to him at the plaintiff's place of business, and was told that it would be there in about ten minutes; a few minutes later Richmond called McGee and told him that the car could not be found, and that further search would be made for it; and later he telephoned him that after a thorough search and investigation it still could not be found, and that it had been stolen. The police were notified of the theft, and through their efforts the car was finally located about four months later at Okmulgee, Okla., but in a damaged condition.

The plaintiff had obtained a policy of insurance on said car from the Automobile Insurance Company of Hartford, Conn., insuring it against loss or damage to said car by burglary or theft; and it collected from the insurance company for the damage to the car, amounting to $375.24, and assigned to it all of its right of action against the defendant for its failure to return or account for said car to the plaintiff, and authorized the insurance company to sue for said damages in the plaintiff's name.

 The case presented is one of bailment for the mutual benefit of the parties, and the obligation of the defendant was for the exercise of ordinary care and diligence in safeguarding and caring for the plaintiff's car, that is, such care and diligence as a capable and reasonably prudent person engaged in the same business is accustomed to exercise. Young v. First Nat. Bank, 150 Tenn., 451, 461, 265 S. W., 681, 40 A. L. R., 868; Tennessee Hermitage National Bank v. Hinds, 1 Tenn. App., 508, 514.

 And the weight of authority supports the proposition that, at least in actions based on negligence, the ultimate burden of proving

negligence is ordinarily upon the bailor, where he is seeking to recover for the loss of property which it is conceded, or which the evidence tends to show, with reasonable certainty, has been stolen while in the possession of the bailee. See annotation on "Presumption and burden of proof of negligence," 26 A. L. R., 232.

In 6 Corpus Juris, Title "Bailments," section 158, page 1158, it is said that:

"The rule is undoubted that in all actions founded upon negligence, or a culpable breach of duty, the burden is on the plaintiff to establish negligence by proof. This principle is recognized by all the authorities as applicable between bailor and bailee, and the only conflict is on the question whether the loss of, or damage to, the goods while in the bailee's possession raises such a presumption of negligence on his part as to establish a prima facie case against him."

In 6 Am. Jur., Bailments, section 368, page 446, the rule is stated as follows:

"Where an action in respect of the thing bailed is brought by a bailor against his bailee in tort, and the complaint expressly alleges negligence on the part of the bailee, or is construed as stating a cause of action based on negligence, the weight of modern authority supports the rule that the ultimate burden of proving negligence rests upon the bailor; and if, at the close of all the evidence, the jury is in doubt whether due care was exercised, the bailor will fail. In such cases the bailor has made negligence a factor in his case, and the rule applies that the party seeking recovery must prove each essential element of his cause of action. This rule is generally supported by those decisions where the fact is assumed, conceded, or established by proof, that the property bailed was stolen, or injured or destroyed by fire. . . ."

Among the cases cited in support of this text are Noel & Co. v. Schuur, 140 Tenn., 245, 249, 204 S. W., 632; Smith v. Noe, 159 Tenn., 498, 505, 19 S. W. (2d), 245, in which it was held that the mere fact of the theft, or the destruction of the subject of the bailment by a fire of unknown origin, would not create a presumption of negligence on the part of the bailee; the burden of proof, therefore, rests upon the plaintiff in the instant case of showing that the theft of its car was the result of the negligence of the defendant in failing "to exercise due care and caution in protecting its said automobile from loss or damage . . . and in failing and refusing to exercise the degree of care required by law," to prevent its being stolen, as alleged in the declaration.

The testimony of the defendant's witnesses leads to the conclusion that the car was stolen from the repair shop during the noon hour, when most of the employees were out at lunch. It was the duty of

Knox, the shop foreman, to see that it was properly serviced and that it was delivered to the owner. He knows nothing about the disappearance of the car, does not know whether he was in the repair shop at the time it was taken out, or not. He was probably out at lunch at the time and he "guessed" that "in this case a man came in and drove it out of the back door." He testified that it was hard to watch all cars back there "because there are so many cars coming in and out." He further testified that in many instances the customers were permitted to take their cars out without getting permission from any one to do so. In answer to questions by the court on this subject, this witness testified:

"The Court: Then you are back there in your shop, and you have a number of mechanics there, don't you?

"A. Yes, sir.

"The Court: And it is your custom out there to let your customers come, if they want to, and get their own cars?

"A. Yes, sir.

"The Court: You do that?

"A. Yes, sir.

"The Court: And you are the man who is supposed to see that they get the right car, and don't take another man's car?

"A. Yes, sir.

"The Court: That is your job?

"A. Yes, sir.

"The Court: What happens when you are away at dinner?

"A. The service man takes charge . . . and sees over the job and waits on the trade until I get back on duty. . . .

The Court: Well, suppose the floorman,—I mean the one waiting on the trade,—is up front, or is not on the floor, and a customer comes in and gets his car, what happens then?

"A. Well, usually the customer always reports to the service department or the cashier.

"The Court: That is usually done, but, of course, it is not always done. In other words, you know that a customer might take his car out without seeing anyone?

"A. Yes, sir.

"The Court: How many customers would you say get their cars directly from the shop?

"A. Not ten percent of them.

"The Court: And it is customary when they do get it, to report to you?

"A. Yes, sir.

"The Court: So, this car could not have been stolen out of there when you weren't around, could it?

"A. Yes, sir; it could be. For instance, so many people might

be there that I might not be able to wait on them all, even if I were there. For instance, we might have 15 or 20 customers in the shop at one time.

"The Court: But don't they have to get releases on the car?

"A. They would not have to get releases from me. They are waiting on the car, and when the mechanic is through with it, then they can go and get in their car and drive it on out.

"The Court:. Will the mechanics let them do that?

"A. Yes, sir. . . .

"The Court: So, a fellow really don't have to report to you to get his car out?

"A. He would not have to, no sir."

Under this system, it was easily possible for a thief to enter the shop during the noon hour when the foreman was not on duty, and drive a car out without attracting the attention of the mechanics who might still be in the shop working on cars, and not charged with the duty of looking after the cars parked on the floor; and, under the testimony of the shop foreman, we are of opinion that the defendant was negligent in failing to provide proper safeguards against the theft of the plaintiff's car.

It is shown that the plaintiff's car was handled in the same way that the cars of other customers of the defendant were handled while in the shop; and that it was the general custom among automobile dealers in Memphis to leave the ignition keys in the cars while they were in the shop; this evidence was competent for the purpose of throwing light on the question of the defendant's negligence under all the circumstances; but the evidence was not controlling or binding upon the plaintiff, because it is not shown that the plaintiff knew of the custom, and for the further reason that the customary way might well be a negligent way.

In Kelton v. Taylor & Co., 79 Tenn., 264, 11 Lea, 264, 47 Am. Rep., 284, which was a suit against a ginner for the value of a bale of cotton which had been stored after it had been ginned, baled, and marked, it was held that it was not error to permit the defendant to prove the custom among ginners so to store cotton which had been ginned, baled, and marked, it appearing that the plaintiff "knew this was their custom."

While usages of trade may be proven to qualify a party's liability for negligence, the rule is, that to be binding, it must be shown that the party against whom it is proven had knowledge of it; or that the custom is so uniform and of such general application, and so well known, that knowledge of it will be implied. Grissom v. Commercial National Bank, 87 Tenn., 350, 10 S. W., 774, 3 L. R. A., 273, 10 Am. St. Rep., 669; Pennsylvania R. Co. v. Naive, 112 Tenn., 239, 79 S. W., 124, 64 L. R. A., 443; Louisville & N. Railroad Co. v.

Fidelity & Guaranty Co., 125 Tenn., 658, 676, 148 S. W., 671; Simms v. Sullivan, 100 Or., 487, 198 P., 240, 15 A. L. R., 678.

And, in Nashville, C. & St. L. Railroad Co. v. Wade, 127 Tenn., 154, at page 159, 153 S. W., 1120, 1121, Ann. Cas., 1914B, 1020, the court say:

"In determining whether the conduct of a defendant under a proven or given state of facts was characterized by the exercise of ordinary care, it is proper to prove the customary way of doing such things in the business in hand; but such evidence is not controlling. It is competent only to throw light on the question, since a customary way may be a negligent way, and at last the jury must determine whether under all of the facts the matter was managed in such a way as a person of reasonable prudence would have managed it."

And see, Puryear v. N. C. & St. L. Ry., 4 Tenn. Civ. App., 742, 4 Higgins, 742, 749, 750.

The custom of automobile dealers in Memphis in leaving the ignition keys in the cars of their customers, while in their shop for repairs, is not the controlling factor in determining the question of the defendant's negligence in this case; it is only one fact to be considered along with all the other facts relating to the manner in which the defendant handled the cars of its customers in its repair shop. From the testimony of the defendant's own employees, we think it clearly appears that it has failed in its duty to exercise reasonable and ordinary care to safeguard and prevent the theft of the plaintiff's automobile, and that it is liable to the plaintiff for the damages sustained by it.

It results that the judgment of the circuit court will be reversed and set aside, and a judgment will be entered here in favor of the plaintiff in error for $375.24, with interest from June 6, 1935, the date of the filing of the suit, and all costs.

Senter and Anderson, JJ., concur.