[No. 18790. Department Two. April 2, 1925.]

ALEXANDER McDONALD, *Respondent*, v. WM. D. PERKINS AND COMPANY, *Appellant*.[1]

BAILMENT (3, 8)—NEGLIGENCE—LOSS OF GOODS—PRESUMPTIONS—BURDEN OF PROOF. In an action against a safe deposit company for the loss of the contents of a rented safe deposit box, defendant is held to the degree of care of an ordinary bailee for hire, and has the burden of explaining the disappearance of valuables from the box at a time when the box was under its control.

SAME (8)—NEGLIGENCE—LOSS OF GOODS—BURDEN OF PROOF—INSTRUCTIONS. In an action against a safe deposit company for the loss of the contents of a rented safe deposit box in which defendant rested its case on the theory that the loss could not have been due to theft, error cannot be assigned by defendant on the court's failure to instruct upon the theory of a theft, without a specific request therefor; nor upon an instruction casting the burden upon defendant to explain the disappearance of valuables at a time when the box was under its control.

SAME (8)—NEGLIGENCE—BURDEN OF PROOF—EVIDENCE—QUESTION FOR JURY. In an action against a safe deposit company for the loss of the contents of a rented safe deposit box, the plaintiff made a *prima facie* case by showing the amount of currency in the box at the time of his visit in the morning, and that it was not there when he returned in the afternoon, during which time it was in the exclusive care and custody of the defendant; and where the defendant's evidence did not account for the loss, the question was one for the jury.

SAME (3)—CONTRACT—DEGREE OF CARE—LIMITATION OF LIABILITY. An original contract for the leasing of a safe deposit box limiting the renter's liability for loss to $100, is superseded by a later contract in writing for a current year, detailing the rights of the parties, without fixing any limitation upon the liability.

SAME (3)—CONTRACT—WAIVER OF LIABILITY. A provision in a contract leasing a safe deposit box to the effect that the lessor shall use due diligence that no unauthorized person shall be admitted to any rented safe and beyond this shall not be responsible for the contents of any rented safe, is not a waiver of liability for the loss of the contents, but only refers to its liability as to unauthorized persons "admitted" to the safe in the usual course of business, under the rules and regulations of the company.

[1] Reported in 234 Pac. 456.

Appeal from a judgment of the superior court for King county, Smith, J., entered February 9, 1924, upon the verdict of a jury rendered in favor of the plaintiff, in an action to recover the value of property lost from a safe deposit box.  Affirmed.

*Carroll Hendron* and *Groff & Davis,* for appellant.

*J. L. Corrigan,* for respondent.

FULLERTON, J.—The appellant, Wm. D. Perkins & Company, a corporation, is engaged in the business of conducting and letting for hire safe-deposit boxes. The record discloses that its business is conducted after approved methods.  The boxes are situated in a vault which can only be entered through the office of the appellant, and then only with the knowledge and consent of the appellant.  The boxes are óf steel construction, are arranged in tiers within the vault, and are consecutively numbered.  Each box has a separate lock which can be opened only by the use of one each of two different sets of keys.  When a box is leased, one set of these keys, usually two in number, is delivered to the lessee and the other is retained by the appellant. In the box is a loose receptacle for the use of the lessee, and into which he deposits the things which he desires to keep in the box.

A lessee desiring to enter his box first appears at the office mentioned.  He is there met by an attendant to whom he gives the number of his box.  The attendant then procures one of the keys to the box kept by the appellant, and enters the vault with the lessee.  On reaching the box, the attendant inserts his key into the lock, whereupon the lessee may open the box by the use of one of the keys he has in his possession.  The lessee is then at liberty to withdraw the receptacle from the box, and may at the box place within it, or remove from it, such things as he desires, or he may take the

receptacle to a booth in the vault prepared for that purpose, and return the receptacle to the box after he is through with it. The receptacles in use in the appellant's boxes were covered, so that the attendant could not know its contents unless the lessee of his own volition disclosed them to him. The booths mentioned had upon them doors which would lock against entrance from the outside when closed. They were also so arranged as to close and lock automatically when a lessee left the booth. This was an additional precaution taken for the safety of the parties concerned. It was found that lessees would remove valuables from the receptacle which they did not replace therein before returning it to the lock box, and it enabled the attendant to examine each booth before its use by another lessee. As a further precaution the appellant kept a record, showing the day and the time of the day each of its lessees made a visit to his box, and, if more than one person had access to a single box, the name of the person making the visit.

The respondent first leased a box of the appellant, to which he had sole access, on October 1, 1910. The term of the lease was for one year. At that time he signed a written contract, which, after reciting the term of the lease and the rental paid therefor, contained the following:

"And it is agreed: That the sum above mentioned is for the rental of said safe-deposit box alone, with right of ingress and egress at such reasonable times as may be fixed by the party of the first part; that the first party has no possession, custody or control over the contents of said box; that the second party assumes all risk in connection with the deposit of such contents, except that said bank is not exempt from responsibility for its own wilful or direct injury to the same; that there shall be no liability upon the part of the bank for loss or injury to the contents of said box from

any cause, unless the parties hereto shall enter into a special written agreement to that effect, in which case such additional charge shall be made by the bank as the value of the contents of the box and its liability on account thereof may justify, but in no event shall the bank be liable for any loss or injury to such contents in excess of the sum of One Hundred Dollars ($100.00). The party of the second part further agrees to make a deposit of One Dollar for the keys furnished as herein stated and at all times to keep on hand a deposit of One Dollar for this purpose, and in case of failure to return the keys, the same shall be retained by the bank; in case both keys shall be lost by the renter and the box shall be opened by the party of the first part, then the renter agrees to pay all sums expended for opening the same and all damages to the box and cost of repairing the same, not to exceed, however, the sum of $5.00 for the repairs in any instance; for any unpaid rental or for any such expense for repairs the party of the first part may take possession of and hold the contents of said box as security therefor and may foreclose such security for rental in any manner provided by law."

The respondent continued to rent the same box year by year until October 1, 1923. The nature of the contract of rental between the years 1911 and 1922 is not shown. When, however, the rental was paid for the year following October 1, 1922, the appellant issued to him the following receipt:

"No. 48227.      Safe Department *Department*
                 Wm. D. Perkins & Co., Bankers.
                 Alaska Building, 211 Cherry Street,
                 Seattle, Wash., Oct. 7, 1922.

"Received from Alex. McDonald Four No/100 Dollars $4.00 for rent of Safe No. 1825 (contents unknown) in the vaults of this corporation from Oct. 1st, 1922, to Oct. 1, 1923, subject to the rules and regulations of the corporation endorsed hereon, all of which have been duly accepted and agreed to by the renter.
                 "Wm. D. Perkins & Co., Bankers
                      per O. N. Galer."

On the back of the receipt was printed the following:

"It is agreed between Wm. D. Perkins & Co., bankers, of Seattle, Wash., lessor, and the several persons, firms and corporations subscribing this memorandum, lessees, that the safes rented by said several subscribers in the deposit vaults of the corporation are so rented upon the following terms and conditions, that is to say:

"1st. The several subscribers, each for himself, or itself, has leased of the said lessor the safe in the said Wm. D. Perkins & Co., Bankers, deposit vault designated by the number for the term and at the rent set after the signature of said subscriber hereto, said term commencing at twelve o'clock noon on the day prefixed to such signature. This agreement shall apply to all subsequent renewals of the lease.

"2nd. Deputies when duly registered are authorized as agents to have access to the safe rented, until notice to the contrary in writing.

"3rd. Each party leasing a safe is to have access to the same for himself or his duly authorized and identified agents at any time during the office hours of the deposit vaults on all days except Sundays and legal holidays.

"4th. No party leasing one or more of said safes shall have the right to assign his lease or sublet any such safe or safes, or to mark or deface it in any way.

"5—. Each party leasing a safe agrees to surrender the same at the expiration of the term in as good order as when rented, reasonable use thereof only excepted, and to pay on demand to the lessor the expense of making all such repairs as may be rendered necessary by the lessee's own or his agent's act or neglect, including changes and alterations in locks and supply of new keys.

"6—. Each party leasing a safe agrees to abide by all such rules and regulations concerning the means of access to his safe, and of identification, of himself or his agents, and generally concerning the means and methods of carrying out the agreement as the lessor may from time to time adopt.

"7—. The lessor shall use due diligence that no unauthorized person shall be admitted to any rented safe, and beyond this the lessor will not be responsible for the contents of any safe rented from it.

"8—. The bank reserves the right to terminate a rental at any time, on written notice to the renter or his deputy, and on refunding a proportionate part of the rent paid. The renter will thereupon withdraw the contents of the box and surrender the keys."

After leasing the box, the respondent, from time to time, made deposits of money and other valuables therein, so that on the morning of August 22, 1923, he had on deposit in the box gold coin of the value of $3,400, currency of the value of $1,170, and a liberty bond of the value of $100. Early in the morning of the day named, he was informed that a relative had been arrested for a misdemeanor and desired him to become bail for him. The amount of bail required was $250, and the respondent went to the box to get that sum to deposit in lieu of a recognizance. He entered the vault in the usual manner. He handed his keys, two in number, which were on an ordinary key-ring, to an attendant, who went to the box, unlocked it in the respondent's presence, took therefrom and handed to him the receptacle with its contents. The respondent took the receptacle to a booth, took therefrom the amount of money he required in currency, replaced the remainder, $920, in the receptacle and handed it to the attendant. The attendant, in his presence, placed the receptacle in the box, locked the box and handed him the keys. The respondent then left the building, but before he had gone far he discovered that he had left a pencil which he had used in making tallies when counting the currency. He returned to the vault and called the attention of the attendant to the fact that he had left the pencil in the booth. The attendant went to the booth, procured the pencil and handed it to him.

He again left the building, went to the court and attended to the business of the bail.

On his way home, he met a real estate agent with whom he had been negotiating for the purchase of some real property, but which had theretofore failed of fruition because he was not willing to pay the price the owner asked for the property. The agent told him that the owner was becoming desirous of making a sale; and further told him that he (the agent) felt that if the respondent would make a cash offer for the property in the sum he was willing to pay and accompany the offer with a cash deposit of $100, that the owner would accept the offer. The respondent concluded so to do and returned to the appellant's place of business for the purpose of obtaining the money to make the deposit. He reached the place shortly after one o'clock in the afternoon, and was admitted to the box by an attendant in much the same manner that he was admitted to it in the morning. On opening the receptacle the currency was missing, although the gold and the liberty bond were found therein. He immediately called attention to the loss and search was made in the booth he had occupied in the morning, and the surroundings, for the money. The currency was not found, although there was found in the booth the small piece of paper on which the respondent made tallies when counting the currency in the morning. Later on in the day he discovered that there was but one of the box keys on his key-ring.

There were some 4,000 boxes in the appellant's vault which were subject to lease. How many of these were actually leased at the time the respondent's property was missed, the record does not disclose, but enough does appear to show that the number was considerable. It also appeared that the daily visits made by lessees to the boxes on different days widely varied;

the records showing that the visits ranged from about 100 to over 400. On the day in question, between the hours of nine o'clock in the morning and five o'clock in the afternoon, 104 lessees visited their boxes. The appellant on that day, for the major part of the time, had two attendants waiting on lessees, and others of its office force were within call for that purpose should an emergency arise requiring additional attendants. It was also given in evidence that the business of the appellant was conducted in the same manner that similar businesses in Seattle (its place of location) were conducted; that it employed the usual number of attendants; that its vault was secure, its boxes of the best construction, and that it took all of the ordinary and usual precautions to prevent losses by its patrons.

The appellant's records showed, and the attendants of the vault testified, that no person visited the respondent's box between the time the respondent visited it in the morning and his return in the afternoon. The one attendant, who had been in attendance at the vault from its opening in the morning until the noon hour, testified that the box was not opened during those hours, other than at the time it was opened in the presence of the respondent.

The appellant, on demand for the return of the currency or its value, refused to recognize liability for the loss, and the present action was instituted to recover therefor. The cause was tried to a jury, which returned a general verdict for the respondent for the amount of the loss. The jury also returned a special verdict to the effect that the evidence did not disclose whether or not the loss was due to the dishonesty of the attendant at the vault.

The appellant makes ten assignments of error.

These, however, it reduces for the purposes of discussion to three propositions, viz.:

(1) Does the burden of allegation and proof in cases of this character rest upon the plaintiff to establish that the loss was due to the negligence of the defendant, or, evidence of the loss having been given, does it devolve upon the defendant to prove that the loss occurred without his fault?

(2) If the burden rests upon defendant, does respondent's evidence, it being uncontradicted in any particular, meet that burden?

(3) Was the contract provision that the lessor, the appellant herein, should not in any event be liable beyond the sum of one hundred dollars, binding upon this respondent?

The first of these has its foundation in certain of the instructions given by the court to the jury. The court, after stating certain propositions which the jury must find in order to find for the respondent, gave them this further instruction:

"If the plaintiff has proved, by a preponderance of the evidence in this case, the points outlined in the foregoing instruction, then it would be your duty to return a verdict in his favor, unless the defendant has shown, by a preponderance of the evidence, that said currency was removed from said box without any fault or negligence on the part of the defendant, or its agents or servants, who were in charge of said safe deposit vault.

"I further charge you that it is the law where personal property is delivered by one person to another for safe keeping, and the person to whom said property is delivered fails to produce it upon demand of the owner, that the burden of explaining the failure to so produce it is upon the defendant, and if he fails to show that his liability to produce said property is not due to any failure on his part to exercise due care, that he is then responsible to the owner of said property for its value."

The appellant excepts to that part of the instruction wherein the court stated that if the jury found that the plaintiff (respondent) had proved by a preponderance of the evidence the propositions it had theretofore outlined, then the burden was on the defendant to show by a preponderance of the evidence that the loss was not the result of any fault or negligence on the part of itself or its agents or servants. The appellant seems to concede that the rule stated by the court, when applied to a non-gratuitous bailee, has support in the authorities, but contends that the relation between a proprietor of a safe-deposit vault and its lessees is not the relation of bailor and bailee in the ordinary legal sense of that relation. It argues:

"The situation in the case of a safe deposit box is entirely different from the ordinary bailment. In the ordinary bailment the bailor delivers the chattel to the bailee, who receives it from the bailor, and from thence until the termination of the bailment it is in his sole custody and keeping. The bailee selects the place and manner of its keeping and he alone has access to it; the bailor having nothing whatever to do with its care or keeping. . . . Respondent's currency was never in the possession of the appellant in the sense that a bailed chattel is in the possession of a bailee. It was in the possession of the respondent, who in order to obtain access to it, had to comply with certain formalities and obtain the co-operation of the appellant, these requirements being intended solely to protect the respondent in his exclusive possession of the box. The appellant could under no circumstances obtain access to the box. The appellant was no more in possession of the contents of respondent's box than an apartment house owner who keeps a watchman at the door is in possession of the tenant's furniture in the several apartments. Appellant was no more a bailee of the currency in that box than the apartment house owner is a bailee of the tenant's jewelry and silver plate."

But we think it unnecessary to define the precise legal relationship between the parties. In a sense it is that of a bailment for hire. While the lessor of the box may not know what the lessee may deposit in the box, he does know that valuables of some sort are deposited therein. Indeed, the very purpose of maintaining the place is to furnish a safe place for the deposit of valuables. The place itself is always under the part control of the lessor, and at certain times it is under its sole and absolute control. This latter condition obtains at all times when the lessee is not at the box, and it would seem that at such times the lessor should be held to that degree of care which an ordinary bailee for hire is held, and that the rules obtaining between the ordinary bailor and bailee should have application. It is our opinion that they do apply, and that the lessor of such a box has the same burdens cast upon him to explain the disappearance of valuables from the box which disappear at the time the box is under its absolute control that a bailee has to explain the disappearance of property left in its possession in the more ordinary case of bailment.

The authorities are not agreed upon the question who has the burden of proof of explaining the disappearance of property from the possession of a bailee. The better rule we think is that adopted by the trial court. The rule has its foundation in necessity; a bailee, having exclusive possession of property, has also the exclusive means of knowing what becomes of it. In fact, he is the only one who can know, and having the exclusive means of knowledge, it is imposing upon him no undue hardship to require him to explain.

The question is not entirely new in this court. In *Kingsley v. Standard Lumber Co.*, 84 Wash. 189, 146 Pac. 369, the facts were that the plaintiff had leased a team of horses to the defendant and that the defend-

ant, while using them, so injured one of them as to cause its death, and so injured the other as to cause it to walk "sidewise." The trial court charged the jury that the burden was upon the defendant to explain the injury, and this instruction we approved, saying that it is a general rule that where property was delivered to a bailee in good condition and returned damaged, or not returned at all, the presumption of negligence on the part of the bailee instantly arises, and that the bailee, if he would escape liability, must show that the damage or loss was not due to his negligence. To the same effect is *Patterson v. Wenatchee Canning Co.,* 53 Wash. 155, 101 Pac. 721. That was an action to recover for the loss of certain beef placed in cold storage. The trial court gave to the jury an instruction similar to the instruction given in the present case. The rule was held inapplicable because of the inherent nature of the property stored. But the rule was recognized as applicable to instances where the property bailed was of such a nature that it would not deteriorate or perish from internal defects; that is to say, where the loss must of necessity have been the result of abnormal causes, such as was the case here.

The appellant contends that the instruction was inapplicable to the facts for another reason. It argues that, if the acts of the respondent as the cause of the loss be eliminated, the fact that it was lost by theft is as completely proven by the demonstrated impossibility of its loss by any other means as it would be by the direct testimony of an eye witness; that, where it appears that property is taken from a bailee by theft, the burden is not upon the bailee to show that the theft was the result of negligence on his part; and that the effect of the instruction was such as to put this burden upon the appellant.

But this was not the theory upon which the appellant

rested its defense. Its whole effort was directed to a showing that there was no possibility of theft. Its evidence tended to show that, between the hour the respondent was at the box in the morning and the hour of his return in the afternoon, the vault was at all times under the eye of its officers and servants; that no unauthorized person entered the vault between those hours, and that the respondent's box was not opened or tampered with during the time. It went even farther than this; it had the attendant, to whom suspicion would most reasonably point, testify that he did not remove the extra key from the respondent's key-ring, nor enter the box in the respondent's absence. In fine, its efforts were directed to a showing that the currency was not lost or wrongfully taken between the visits of the respondent, and it sought to have the deduction drawn which would naturally follow such a showing, namely, that the respondent was either mistaken in his belief that he had in the morning left the currency in the box, or was attempting wilfully and fraudulently to deceive. The appellant therefore did not, and, in the light of its evidence, hardly could, ask the court to charge upon the theory of theft. If, however, it would have been permissible for the court to so charge, its failure so to do is not fatal to the judgment. It is rather non-direction than mis-direction, and non-direction is not a sufficient ground upon which to predicate error, unless there is a specific request to charge upon the omitted matter and the request is refused. *Allend v. Spokane Falls & N. R. Co.,* 21 Wash. 324, 58 Pac. 244; *Lownsdale v. Grays Harbor Boom Co.,* 21 Wash. 542, 58 Pac. 663; *Tacoma v. Wetherby,* 57 Wash. 295, 106 Pac. 903; *Zolawenski v. Aberdeen,* 72 Wash. 95, 129 Pac. 1090; *Dahlgren v. Chicago, Milwaukee & P. S. R. Co.,* 85 Wash. 395, 148 Pac. 567.

Moreover, the possibility of a loss by theft is but an inference to be drawn from the facts given in evidence. Nor is it the only inference that can be drawn therefrom. From the fact that the appellant found it necessary for the protection of its lessees to resort to booth doors which would automatically close and lock against entrance from the outside without the assistance of keys, of itself suggests a cause for the loss consistent with the honesty of both parties, but for which the major blame would rest upon the appellant. We cannot conclude, therefore, that there was error in the instruction of which complaint is made.

Under the second of the stated propositions, the appellant argues that its motion for a directed verdict, or, failing in that, its motion for judgment notwithstanding the verdict, should have been granted. But without following the somewhat extended argument of the appellant, we think the question was one for the jury. The respondent made a *prima facie* case when he showed that the currency was in the box at the time of his visit thereto in the morning, that it was not there when he returned in the afternoon, and that in the meantime the box had been in the sole and exclusive care and custody of the appellant. "The ordinary rule established by numerous authorities is, that when the plaintiff has proved the deposit of his goods, and a failure of the defendant to produce the same on demand, he has established a *prima facie* case, and the defendant must excuse his failure to produce, by bringing himself within one of the recognized exceptions." *Lockwood v. Manhattan Storage & Warehouse Co.,* 28 App. Div. 68, 50 N. Y. Supp. 954. The recognized exceptions are loss of the goods by fire, loss by theft, loss by leakage, or loss by the act of God. *Firestone Tire & Rubber Co. v. Pacific Trans. Co.,* 120 Wash. 665, 208 Pac. 55, 26 A. L. R. 217. In this instance the

appellant did not show a loss by reason of any of these means. It was unable to account in any manner for the loss of the goods, and whether the evidence it did produce overcame the *prima facie* case made by the respondent was a question of fact for the jury, not one of law for the court.

The third of the propositions also must be answered in the negative. The original contract in which the limitation on liability is contained expired by its terms at the end of the first year. The parties were at liberty thereafter either to make a new contract fixing the measure of liability or to continue the original one. As we have said, the contracts for the intermediate years are not shown, but plainly the entire terms of the contract for the last year, the year in which the property was lost, save those which the law itself implies from the nature of the contract, are expressed by the terms and conditions written on the back of the receipt given for the rental paid for that year. This contract contains no limitation as to the amount of the appellant's liability. With reference to the seventh clause of the contract, we adopt the reasoning and conclusion of the California court in *Cussen v. Southern California Sav. Bank,* 133 Cal. 534, 65 Pac. 1099, 85 Am. St. 221, wherein it is said:

"It is insisted that subdivision 7 of the agreement entered into between these parties amounted to a waiver of liability. That provision declares: 'The lessor shall use diligence that no unauthorized person shall be admitted to any rented safe, and beyond this the lessor shall not be responsible for the contents of any safe rented from it.' In considering this clause of the contract, appellant declares its construction to be: 'The word "admitted," therefore, defined by the facts and circumstances attendant upon the making of this contract, and in connection with the contract itself, refers to such persons as might be admitted to the safe-deposit vaults in the usual course of the business,

and under the rules and regulations of the bank; and the admission of any "unauthorized" person therefore refers to a person gaining access to the box in the usual course of business, when in fact he had no right to do so. And the diligence to be exercised by the bank was to guard against false impersonation and forgery by a person claiming to be a renter or a deputy.' Adopting this construction of the contract as the correct one, then the court is assured that the balance of the clause, 'and beyond this the lessor shall not be responsible for the contents of any safe rented from it,' only refers to its liability as to those persons 'admitted' to the safe, as the word 'persons' is defined by defendant's construction of this clause. Under the construction of this clause as contended for by defendant, it could open wide the doors of its vaults, leave the building without any protection whatever, and thereafter, by invoking this provision of the contract, relieve itself of liability for the property of depositors stolen therefrom by thieves. This position is not maintainable in law, and the aforesaid clause was only intended to fix the degree of care required to be exercised by defendant, not in guarding the property placed in its charge, but in the identification of parties claiming to be its customers. It follows, therefore, that the defendant was called upon by the law to use that degree of care in the safe-keeping of this property which is demanded from a bailee for hire in the keeping of valuable property. He was required to use that degree of care in the protection of this property from thieves without and thieves within, and it was required to use that same degree of care in the selection of its employees, and in the supervision of their conduct after they were employed."

Our conclusion is that the judgment must be affirmed, and it is so ordered.

Holcomb, Mackintosh, Bridges, and Main, JJ., concur.