ROYAL B. FARNUM *v.* THE CONNECTICUT BANK
AND TRUST COMPANY

SUPERIOR COURT        WINDHAM COUNTY        FILE NO. 11454

Memorandum filed December 7, 1960

*Carlos B. Ellis,* of Middletown, for the plaintiff.

*Regnier & Moller,* of Hartford, for the defendant.

COTTER, J.   The plaintiff, a retired professor seventy-six years of age, sues to recover securities, or their value, which he claims to have placed in a safe deposit box.

He rented the box from the defendant at its Willimantic branch.   General Statutes § 36-57 (s).   He purchased negotiable bonds valued at approximately $8400, represented by five certificates, on October 18, 1957, from Wood, Struthers and Company of New York and purportedly received them in a large manila envelope by registered mail, probably on October 19, a Saturday.   He opened the envelope at that time, examined the certificates and then placed the unsealed envelope containing them in an unlocked deep filing drawer in a desk at his home in Hampton, Connecticut.   He left Hampton October 20, Sunday, in company with his wife, to visit their daughter in New York, placing the bonds in a small zipper brief case which he packed in a larger suitcase for travel by automobile.   They returned to Willimantic on October 25, Friday, after visiting with their daughter and her family, arriving in front of the bank about noontime.   He parked at a meter, purportedly took the zipper case out of the suitcase, proceeded to remove the manila envelope, then its contents, and inserted them in a smaller envelope, about nine and one-half inches by four and one-eighth inches, which he placed in the inside pocket of his suit coat.   He went into the bank and after going through the necessary procedures received his box, took it into a small room, removed the securities from the small envelope which he took from his coat pocket and supposedly placed them in the box.   He closed and latched the box and returned it to the attendant, who placed it in the vault within

the plaintiff's line of vision. The plaintiff had not examined the bonds from the time he left on October 20 through the time he allegedly put them in the box on October 25. He made a visit to the box on December 31 to put in another security. On January 24, 1958, the plaintiff, at the request of his son-in-law, who was about to make out the plaintiff's income tax return, opened the box at the bank to list the securities he owned. He then discovered that the bonds he thought he had left in the vault on October 25, 1957, were not in the box.

The court visited the bank, viewed the premises and heard testimony there. The vault and boxes were made and installed by the Moseley Company. To enter the vault, the customer signs a card, the attendant opens a grill door by key, then a guard key is inserted in the box lock, and the customer's key, given to the attendant, is inserted. The lock is opened, and the box is taken out and given to the customer, who takes it to a booth. When he returns with the box, the grill door is opened by key again and the keys inserted, the box locked and the customer's key returned. There are only two customer keys, which are kept by the customer, and if they are lost the box must be drilled open. In such a case the lock is changed and the customer given a new box and new keys. The customer's key cannot be returned to him unless the box space is locked.

What happened to the bonds is a mystery. Duplicates were issued for all the bonds except the $5000 Federal Land Banks 4½ per cent. In a letter to Wood, Struthers and Company dated January 27, 1958, the plaintiff states in part:

"Dear Sirs:

   .    .    .    .    .

"On Friday, October 25, I took them to the bank and supposedly placed them in the box with other

securities. My wife recalls telling me to tuck them safely in an inside pocket when I left the car to enter the bank. I signed for the box and to the best of my memory put these securities in it and saw that the box was returned to its space in the vault.

"Upon checking up on the contents of the box on Friday, January 24, 1958 I discovered that these four securities were missing. I am completely mystified over the situation. I certainly had the securities and took out my box in which to file them. The securities made a sizeable package. In leaving the small room in which I had them with the box it would seem that I could hardly have failed to notice them had I closed the box with out placing them inside, and left them on the table. And yet this is the only conclusion I can come to.

"At all events the securities are gone, either lost in some manner or stolen.

"I have notified the bank. I have searched and researched my home. My wife and I have carefully reviewed our movements. She remembers, confidently, my placing them from brief case into my inner coat pocket and going directly to the bank.

"I left the bank with a distinct sense of relief that they were safely cared for. As a rule I try to be extremely careful, especially about matters of this kind, but I am forced to acknowledge that I must have made a careless move somewhere. I was completely dumfounded to discover them gone.

"I fear the securities have been stolen but I am hoping that in some way recovery in part or in whole may be made, that the situation isn't entirely hopeless."

The first notice of a claim against the bank was made in a letter dated July 23, 1959, prepared by a New York lawyer.

In a case such as this, where the bank leases a safe deposit box, the relationship of bailor and bailee exists as to securities or valuables placed in such box, even though the bank has no knowledge as to the property deposited. Note, 14 A.L.R.2d 948, 954. It is a bailment for hire and mutual benefit. This is true even though access to the contents can be had only by use of a key retained by the lessee, and the relationship is distinguished from that of landlord and tenant. 6 Am. Jur. 492, § 408. In general the rights, duties and liabilities of the parties seem to be that the bank "holds out to the public the implied agreement that property placed in its custody will be protected, so far as reasonable human foresight will permit, from the ordinary dangers to which valuables . . . are exposed." 6 Am. Jur. 496, § 413; note, 40 A.L.R. 874, 879. There appeared no special contract between the parties herein limiting any rights, duties or liabilities. See *Samelson* v. *Harper's Furs, Inc.,* 144 Conn. 368.

Generally, a bailee owes the duty to return or account for the property deposited. *Nothnagle* v. *New York, N.H. & H.R. Co.,* 139 Conn. 278, 283. On demand, the bank must produce the contents, and if it cannot do so it must account for its failure by showing some reason to excuse such failure. It has been held that a loss through theft excuses the bank from its obligation to redeliver, in the event it has exercised ordinary care to prevent the theft. *Morgan* v. *Citizens Bank,* 190 N.C. 209, 42 A.L.R. 1299; *Young* v. *First National Bank,* 150 Tenn. 451, 40 A.L.R. 868.

Under the above authorities, it has been held that the bank must exercise reasonable care in keeping such property, in the selection of its employees and in the supervision of their conduct and is liable only when the loss results from a failure to exercise ordinary care, since the bank is not an insurer except

by special contract or statute. See also *Aetna Casualty & Surety Co.* v. *Poppel & Sons Service Station, Inc.*, 142 Conn. 598, 605. They likewise hold that a prima facie case is made out when the contract, delivery of property and failure to return the contents on demand are shown, but it does not shift the burden of proof, since "although the duty to go forward and rebut the prima facie case is on the defendant, the risk of nonpersuasion on the whole issue is on the bailor as plaintiff." 7 Am. Jur. 289, § 411, citing *Morgan* v. *Citizens Bank,* supra.

The plaintiff appears to rely solely on a complaint sounding in contract, offering proof of the contract of bailment and of the failure of defendant to return the bonds, as was the attempt in *Watrous* v. *Sinoway,* 135 Conn. 424, 426, where it was said the plaintiff can choose either contract or tort. The bailee agrees by implication to exercise ordinary care; *Douglass* v. *Hart,* 103 Conn. 685, 689, 44 A.L.R. 820; and is required to show that the loss was not due to its negligence. *Murray* v. *Paramount Petroleum & Products Co.,* 101 Conn. 238, 242, where the court says: "The failure of the bailee to perform his contract to return the goods raises a presumption that their nonproduction is due to the negligence of the bailee, and by proof of such nonproduction the bailor makes out a prima facie case of negligence, which may be overcome by the bailee by any explanation which shall satisfy the trier that the loss was not due to his failure to exercise reasonable care in the custody of the goods." The denial of a breach of contract "by answer definitely raised the issue of proper care," and "[t]he question . . . was whether or not the defendant was negligent." *Watrous* v. *Sinoway,* supra.

Proof of nonproduction makes out a prima facie case; the bailee must then prove the actual circumstances; and thereafter, the burden on the whole

case is upon the bailor. *Frissell* v. *John W. Rogers, Inc.*, 141 Conn. 308, 310, 312. The bank showed upon all the circumstances it used proper care, and the plaintiff did not show by a fair preponderance of the evidence the facts of the deposit or the breach of defendant's contract. A plaintiff prevails "because of the strength of his own" case. *Silva* v. *Hartford,* 141 Conn. 126, 128. The plaintiff is uncertain as to the happenings; a fortiori, the court is uncertain. In argument, counsel suggested that the attendant might have palmed the plaintiff's key and made a wax impression of it. This is pure conjecture from the circumstances as related to the court. There were too many safeguards thrown up by the bank, and the young lady attendants seemed far from having the legerdemain of a Houdini to accomplish such a feat in view of a customer or others.

The issues are found, and judgment may enter, for the defendant.