WILLIAM O'MALLEY vs. PUTNAM SAFE DEPOSIT
VAULTS, INC.

Essex. September 13, 1983. — December 30, 1983.

Present: GRANT, KAPLAN, & DREBEN, JJ.

*Agency,* Scope of authority or employment. *Negligence,* Safe deposit
company, Contributory, Comparative. *Bailment.*

In an action arising from the conversion of gold coins which had been
stored by the plaintiff in a safe deposit box rented from the defendant,
a company engaged in renting safe deposit boxes and trading in gold,
the plaintiff was not entitled to raise for the first time on appeal the
claim that an officer of the company, who had converted the coins,
had been acting as the company's agent in making an arrangement
with the plaintiff for borrowing the coins for "quick deliveries" to
other customers of the company [336]; moreover, evidence at the trial
failed to show that the borrowing arrangement, which resulted in the
conversion, was a transaction regular on its face with the officer ap-
pearing to be acting in the ordinary course of the business confided to
him [336-338].
In an action against a safe deposit company by a depositor of gold coins
which were later removed from the plaintiff's safe deposit box through
the misconduct of an employee of the defendant, there was sufficient
evidence to permit a finding that the defendant was negligent in fail-
ing to establish additional safeguards in its security system and in
neglecting to provide more supervision over its employees, and that
this negligence was the proximate cause of the plaintiff's loss. [338-
343]
In an action for negligence and breach of contract against a safe deposit
company by a depositor of gold coins which were later removed from
the plaintiff's safe deposit box through the misconduct of one of the de-
fendant's employees, evidence of negligence by the plaintiff causing,
or contributing to, his loss did not bar recovery as matter of law, but
was to be considered by the jury under the comparative negligence
statute, G. L. c. 231, § 85, in apportioning damages. [343-344]

CIVIL ACTION commenced in the Superior Court Depart-
ment on October 25, 1979.

The case was tried before *O'Leary,* J., sitting under statu-
tory authority.

*Neil Rossman* for the plaintiff.

*Anil Madan (Marijane Diodati* with him) for the defendant.

DREBEN, J.  At the close of the plaintiff's case, the trial judge allowed a motion for a directed verdict for the defendant on all counts.  The plaintiff (O'Malley) urges that the evidence, taken as it must be in the light most favorable to him, was sufficient to withstand a motion for a directed verdict under the legal test, namely, whether "anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn" in his favor.  *Poirier* v. *Plymouth,* 374 Mass. 206, 212 (1978), quoting from *Raunela* v. *Hertz Corp.,* 361 Mass. 341, 343 (1972). *Kanavos* v. *Hancock Bank & Trust Co.,* 14 Mass. App. Ct. 326, 327 (1982).  We hold that the plaintiff has not produced sufficient evidence on count one of his complaint, but we are constrained to reverse on counts two and three.

We review the evidence as colored appropriately in favor of the plaintiff.  In July, 1979, O'Malley went to his safe deposit box at the defendant, Putnam Safe Deposit Vaults, Inc. (Vaults), and discovered that well over one hundred gold coins known as Krugerrands were missing.  The coins had been converted by one Peter Caten, then a vice-president of Vaults.

The story begins in 1976, when Vaults was formed by officers of F.L. Putnam & Co. Caten, a director and vice-president of Vaults, was put in charge of its safe deposit box operation.  It was his responsibility to "make sure that the vaults were operated in a safe and secure manner."  Later the business was expanded, and Vaults undertook to buy and sell gold for customers of F.L. Putnam & Co.  The latter's salesmen, including O'Malley, were told by Stephen Putnam, president of both Vaults and F.L. Putnam & Co., to make purchases and sales of gold through Vaults and to place their orders with Caten.  O'Malley, a vice-president of F.L. Putnam & Co. and manager of its Schenectady, New York, office, knew Caten well, as both men had been sales representatives of F.L. Putnam & Co.

On a trip to Boston in January, 1978, O'Malley made the first of several gold coin purchases, in the form of Kruger-rands, for his own account through Caten. At the same time he rented a safe deposit box from Vaults to hold the coins which, Caten informed him, would be delivered in about thirty days. O'Malley signed a card for the box, la-beled "Rental Contract," and received two keys to his box. Caten, however, suggested that he, Caten, keep one of the keys so that he would be able to put the coins in the box when they were delivered. Caten told O'Malley it was "customary" for him to keep a key if a customer wanted coins delivered to his box. In addition to the special key for O'Malley's box, Caten had access to the general pass key which was needed before an individual key could be used to gain access to any given safe deposit box.

The price O'Malley paid in Janaury, 1978, for the gold coins was $182 per Krugerrand. O'Malley gave Caten $18,600 in cash; the excess over $18,200 was to cover the commissions and the box rental fee.

At the time of his first gold purchase, O'Malley, as well as F.L. Putnam & Co., Stephen Putnam and others, were de-fendants in a lawsuit brought by a customer of F.L. Putnam & Co. Stephen Putnam had suggested to O'Malley that it would be prudent to conceal his assets while the suit was pending. Accordingly, O'Malley kept some of his assets in cash and wanted the purchase of Krugerrands to be kept se-cret, even from the Putnams. He informed Caten of his in-tent, and Caten indicated that a numbered or anonymous box could be arranged by Vaults.

Approximately three months later (April, 1978), O'Mal-ley returned to Boston, went to his box, counted the coins, and then placed an order for twenty additional Kruger-rands. At that time Caten sought permission to borrow some of O'Malley's coins to make what O'Malley described as a "quick delivery"[1] to customers of Vaults. O'Malley

---

[1] O'Malley explained the term "quick delivery" as a method by which a customer buying coins would receive them right away instead of waiting three or four weeks for delivery.

agreed to give the "idea a try" if Caten would do it with a limited number of coins, i.e., ten to twenty, and if he would keep a careful record of each borrowing and return of coins. Caten also offered to share the profits with O'Malley, an offer which O'Malley rejected.[2] On a visit to his box in May, 1978, O'Malley discovered that it contained Mexican pesos (of the same value) instead of Krugerrands. Upset, he rescinded Caten's authority to borrow and obtained assurances that the Krugerrands would be returned. O'Malley, however, left the key with Caten and made additional purchases of coins in June and August of 1978.

Caten called O'Malley in April, 1979, and told him he had borrowed one hundred coins. O'Malley directed Caten to return the coins forthwith, reminding Caten that he was no longer authorized to borrow coins. Caten promised to redeliver the gold, but when O'Malley came to Boston in July, 1979, Caten disclosed that there were no Krugerrands in the box and that he, Caten, had converted them. The next day, with legal advice, O'Malley drafted an agreement for repayment by Caten. That agreement, signed by O'Malley as well as Caten, acknowledged that Caten, without authorization, borrowed Krugerrands to facilitate deliveries to customers of Essex Trading Company.[3]

O'Malley, although questioned in July, 1979, by David Putnam (brother of Stephen Putnam and a director of Vaults), did not disclose his loss. It was not until the fall of 1979 that O'Malley informed the Putnam brothers of his problems with Caten and sought to charge Vaults with Caten's defalcation.

O'Malley's complaint against Vaults was in three counts. Originally, Caten was named as a defendant, but he ad-

---

[2] See note 6, *infra*.

[3] Although Vaults argues that the agreement is an admission binding on O'Malley that Caten was acting on behalf of his own company, Essex Trading Company, rather than as an agent of Vaults, the admission, if it be that, "was but a part of [the] evidence to be weighed with the rest, and [O'Malley] was not concluded by it." *Tully* v. *Mandell*, 269 Mass. 307, 309 (1929). Liacos, Handbook of Massachusetts Evidence 277 (5th ed. 1981).

mitted liability, and a judgment, not involved in this appeal, was entered against him.

1. The first count, alleging a breach of contract, claimed that O'Malley had entered into an agreement with Vaults to purchase 178 Krugerrands and that only forty-five had been delivered; that Vaults had refused to deliver the coins and, therefore, failed to meet its obligations under the agreement. On appeal, O'Malley, recognizing that the evidence showed that the gold coins had, in fact, been purchased and delivered to O'Malley's safe deposit box, argues that Caten, as the agent of Vaults, made a new agreement with him for the borrowing of coins. Caten, he urges, could be found to have had actual or apparent authority to make this additional arrangement to borrow O'Malley's coins for "quick deliveries" to customers of Vaults.

The difficulty with this argument is two-fold. First, O'Malley did not make this contention known to the trial judge at the time of the hearing on the defendant's motion for a directed verdict. See *Marcil* v. *John Deere Indus. Equip. Co.*, 9 Mass. App. Ct. 625, 629 (1980). Even if the allegations of the complaint might be said to encompass these claims and even if the evidence could be found to support them, O'Malley cannot raise these characterizations of count one for the first time in this court. *Id.*[4] See *Roto-Lith Ltd.* v. *F.P. Bartlett & Co.*, 297 F.2d 497, 500 (1st Cir. 1962).

Moreover, the plaintiff failed in his burden of showing that the borrowing arrangement which resulted in the conversion was a transaction regular on its face with Caten appearing to be acting in the ordinary course of the business

---

[4] The only time, other than on appeal, that this argument appears to have been suggested was in the plaintiff's answer to an interrogatory. There is no indication in the record appendix that the plaintiff's answers to interrogatories were introduced in evidence and that this theory of recovery was at any time brought to the attention of the trial judge, let alone at the time of the hearing on the defendant's motion. See S. *Kemble Fischer Realty Trust* v. *Board of Appeals of Concord*, 9 Mass. App. Ct. 477, 479-480, cert. denied sub nom. *Costello* v. *Board of Appeals of Concord*, 449 U.S. 1011 (1980).

confided to him. See *Foster* v. *Essex Bank,* 17 Mass. 479, 510-513 (1821); *Haskell* v. *Starbird,* 152 Mass. 117, 120-121 (1890); *New England Acceptance Corp.* v. *American Manufacturers Mut. Ins. Co.,* 4 Mass. App. Ct. 172, 180 (1976), S.C., 373 Mass. 594 (1977); Restatement (Second) of Agency § 261 & comment a (1958).[5] Although both O'Malley and Caten testified that the borrowing was to enable Vaults to service its customers, that fact, even if true, is insufficient to show Caten's actual or apparent authority. Cf. *Kelly* v. *Citizens Fin. Co. of Lowell, Inc.,* 306 Mass. 531, 533 (1940). O'Malley acknowledged that Caten's offer to share profits with O'Malley for letting Caten borrow the coins was improper.[6] This admission may be construed as a recognition by O'Malley that the borrowing itself was suspect. Even if not, O'Malley's erroneous belief is insufficient to charge Vaults. Not only was there no evidence suggesting that Caten's borrowing was known to, or acquiesced in by, his superiors, but there was no showing that borrowing gold from one customer to deliver to another was within the usual responsibility of a person in Caten's position or that such practice could be viewed as reasonably necessary to his authorized duties. See *James F. Monaghan, Inc.* v. *Lowenstein & Sons,* 290 Mass. 331, 333 (1935); *Kelly* v. *Citizens Fin. Co. of Lowell, Inc.,* 306 Mass. at 533. Without such evidence no inference of actual or apparent authority can

---

[5] Comment a states in part: "Liability is based upon the fact that the agent's position facilitates the consummation of the fraud, in that from the point of view of the third person the transaction seems regular on its face and the agent appears to be acting in the ordinary course of the business confided to him."

[6] What was meant by "the profits" was never explained. O'Malley testified that when Caten made his offer to share, if "we" made any profits, O'Malley took the "we" to mean Vaults. We do not consider the implications of a possible future jury finding that O'Malley participated with Caten in the gold borrowing business for their mutual benefit, or of a finding that O'Malley knew that Caten was acting, not for Vaults, but for his own account and that O'Malley failed to inform his employer F.L. Putnam & Co. of this fact. These matters, if they should arise on a retrial (of counts two and three), may significantly alter the legal principles applicable to this action.

properly be drawn. Compare *Kanavos* v. *Hancock Bank & Trust Co.*, 14 Mass. App. Ct. at 331-333. Accordingly, we conclude the trial judge did not err in directing a verdict on the first count.

2. The remaining two counts allege negligence and the breach of a contract other than the contracts specified in count one. In count two, O'Malley claimed that Vaults negligently failed to supervise its employees whose misconduct caused his loss. In count three, he alleged that, in violation of the terms of its rental agreement, Vaults removed gold coins from O'Malley's safe deposit box.[7] (In count one he had alleged breach of the contract to deliver gold, or breach of the borrowing arrangement.)

Although the parties have focused on the question of whether Vaults was a bailee of the contents of O'Malley's box, we need not find a bailment in order to impose on Vaults a duty of exercising due care over the contents of the

---

[7] The evidence does not support any claim on count three other than breach of the duty of due care. As will be discussed in this part 2, Vaults is not an insurer. We do not think that the theory set forth in part 1, *supra*, see especially n.5 and accompanying text, is supported by any evidence from which an inference can be drawn that Caten, by accepting a key and going into O'Malley's safe deposit box, was acting in the ordinary course of the business confided to him by Vaults. For an employee of a safe deposit company to be authorized to go into a customer's box and thereby make the company liable requires "special circumstances." Cf. *Sheldon* v. *First Fed. Sav. & Loan Assn.*, 566 F.2d 805, 808 (1st Cir. 1977). O'Malley has shown none here. There was no testimony that Caten had actual authority to accept keys to enter a customer's box and his statements to O'Malley that it was "customary" for him to keep a key if a customer wanted coins delivered is "not competent evidence of his [apparent] authority . . . [citations omitted]. Apparent authority is not established by the putative agent's words or conduct, but by those of the principal." *Rubel* v. *Hayden, Harding & Buchanan, Inc.*, 15 Mass. App. Ct. 252, 255 (1983). *Sheldon* v. *First Fed. Sav. & Loan Assn., supra* at 808.

Even if Caten were authorized to accept keys, there is no evidence to support the conclusion that Caten would be an agent of Vaults for purposes of entering the box; the authority given would be only permission by Vaults for him to become an agent of O'Malley for purpose of entry into the latter's box.

box.[8] There is in the rental, "by the very nature of the transaction," a duty of care to safeguard these contents. *Jones* v. *Morgan,* 90 N.Y. 4, 8-9 (1882). The obligation to discharge that duty is "implied from the relation between the parties." *Id.* at 9. *McDonald* v. *Perkins & Co.,* 133 Wash. 622, 632 (1925). Restatement (Second) of Torts § 323 (1965).

What will constitute due care will, of course, vary with the circumstances. Even though Vaults may not be a

---

[8] Considerable authority elsewhere finds the relationship of bailment in the rental of a safe deposit box. See, e.g., *Farnum* v. *Connecticut Bank & Trust Co.,* 22 Conn. Supp. 257, 261 (Super. Ct. 1960); *National Safe Deposit Co.* v. *Stead,* 250 Ill. 584, 593-594 (1911), aff'd, 232 U.S. 58 (1914); *Security Storage & Trust Co.* v. *Martin,* 144 Md. 536, 550 (1924); *Kramer* v. *Grand Natl. Bank,* 336 Mo. 1022, 1035 (1935); *Morgan* v. *Citizens Bank,* 190 N.C. 209, 212 (1925); *Bank of California* v. *Portland,* 157 Or. 203, 208, cert. denied 302 U.S. 765 (1937); *Trainer* v. *Saunders,* 270 Pa. 451, 452 (1921); see also *Cussen* v. *Southern California Sav. Bank,* 133 Cal. 534, 535 (1901); *Young* v. *First Natl. Bank,* 150 Tenn. 451, 457-459 (1924); *West Cache Sugar Co.* v. *Hendrickson,* 56 Utah 327, 337 (1920); 9 Williston, Contracts § 1045, at 958-960 (3d ed. 1967); Brown, The Law of Personal Property 260 (2d ed. 1955). Contra *Wells* v. *Cole,* 194 Minn. 275, 278 (1935); *Dupont* v. *Moore,* 86 N.H. 254, 260 (1933).

There are, however, as the trial judge recognized, conceptual difficulties in finding a bailment under Massachusetts law. Not only does the depository not have exclusive control over the box, but the depository usually lacks knowledge of its contents. In Massachusetts, the liability of a bailee is not imposed with respect to the contents of a box or other container unless the alleged bailee has knowledge of such contents. *Sawyer* v. *Old Lowell Natl. Bank,* 230 Mass. 342, 346 (1918). *D.A. Schulte, Inc.* v. *North Terminal Garage Co.,* 291 Mass. 251, 256-257 (1935). *Stuart* v. *D.N. Kelley & Sons,* 331 Mass. 76, 78-79 (1954). Cf. *Bottom* v. *Clarke,* 7 Cush. 487, 489-490 (1851); *Commonwealth* v. *Lotten Books, Inc.,* 12 Mass. App. Ct. 625, 631 n.9 (1981). In the present case, Caten's knowledge of the coins cannot be imputed to his principal, Vaults. While "an innocent third party may properly presume the agent will perform his duty and report all facts which affect the principal's interest, . . . this general rule does not apply when the third party . . . is acquainted with circumstances plainly indicating that the agent will not advise his principal." *Mutual Life Ins. Co.* v. *Hilton-Green,* 241 U.S. 613, 622 (1916). See Restatement (Second) of Agency § 281 (1958). O'Malley expressly asked Caten to keep his purchases confidential and had reason to believe Caten would comply with his request. In such circumstances, O'Malley's request precludes imputing any knowledge of the coins to Vaults. *Imperial Fin. Corp.* v. *Finance Factors, Ltd.,* 53 Haw. 203, 205, 206 (1971).

bailee, the bailment cases are instructive on the nature of the duty of care owed by a safe deposit company, as that duty is the same, however denominated. See *Jones* v. *Morgan,* 90 N.Y. at 9; *McDonald* v. *Perkins & Co.,* 133 Wash. at 632. See also *Dupont* v. *Moore,* 86 N.H. 254, 261 (1983); Jacobs, May the Contents of a Safety Deposit Box be Garnished?, 21 B.U.L. Rev. 528, 530 (1941). Brown, The Law of Personal Property 259 (2d ed. 1955).

In *Foster* v. *Essex Bank,* 17 Mass. at 501, an ancient case, but one still having vitality, the court explained (in dictum) the duty of a bailee for hire. "[T]he common understanding of a promise to keep safely would be, that the party would use due diligence and care to prevent loss or accident: and there is no breach of faith or trust, if, notwithstanding such care, the goods should be spoiled or purloined. Anything more than this would amount to an insurance of the goods." Thus, a loss due to theft, in the absence of negligence, would fall upon the owner and not the safe deposit company even if the theft were occasioned by the employees of the company itself, it they were not acting within the scope of their employment. *Id.* at 508, 510, 512.

We recognize that in certain cases, e.g., innkeepers, common carriers and the like, the relationship imposes, as a matter of public policy, a special standard almost akin to that of an insurer. See *Hanna* v. *Shaw,* 244 Mass. 57, 59 (1923). Thus, persons engaged in certain occupations may be held liable in contract for acts of their employees even if those employees are acting outside the scope of their duties. E.g., *Bryant* v. *Rich,* 106 Mass. 180, 188-189 (1870) (passenger on steamboat); *Vannah* v. *Hart Private Hosp.,* 228 Mass. 132, 138 (1917) (patient in hospital); *Gilmore* v. *Acme Taxi Co.,* 349 Mass. 651, 652 (1965) (passenger in taxi). See also Restatement (Second) of Agency § 214 & comment a (1958). With reference to banks or safe deposit companies, there is in Massachusetts no similar recognition of a public policy imposing liability. *Foster* v. *Essex Bank,* 17 Mass. at 510. We think *Foster* is controlling. But see *City Sav. Bank & Trust Co.* v. *Pluchel,* 37 Ohio App. 423, 431-432 (1931).

Accordingly, we conclude that the duty of due care under counts two or three, whether the action be denominated contract or tort, see *Abrams* v. *Factory Mut. Liab. Ins. Co.*, 298 Mass. 141, 144 (1937), is that of a prudent person operating a safe deposit business. See *Greenberg* v. *Shoppers' Garage, Inc.*, 329 Mass. 31, 35 (1952). See also G. L. c. 158, § 17, as amended by St. 1980, c. 484.[9]

We think the judge erred in directing a verdict on the negligence claims of counts two and three. "Only when no rational view of the evidence warrants a finding that the defendant was negligent may the issue be taken from the jury." *Mullins* v. *Pine Manor College*, 389 Mass. 47, 56 (1983). This is not the case here.

In addition to the evidence previously recounted, there was testimony that, when Caten was hired, he had informed Vaults of his own gold trading business, known as Essex Trading Company, that Caten had a discussion with Stephen Putnam as early as 1976 with reference to coin shortages, that Caten's gold shortages occurred as far back as 1977, that Vaults permitted Caten to act in the dual capacity of managing the safe deposit box operation and selling gold, that after 1978 Stephen Putnam was the only one who supervised Caten, that he saw Caten only weekly, that Caten was only required to file one annual report concerning his activities, that there were no written procedures concerning the renting of boxes or trading in gold, that there was no rule against an employee of Vaults being deputized to enter safe deposit boxes of customers, and that Caten and also David Putnam had keys to boxes of customers other than O'Malley. In these circumstances, we think the jury could find that Vaults, in view of the inherent risks

---

[9] The statute requires that notice in writing be given to the lessee of a safe deposit box that insurance coverage for the contents is not provided by the bank or safe deposit company. Although this provision was enacted subsequent to Caten's conversion, its legislative history recognizes that, under preexisting law, a bank was also not an insurer. See Comments of the Secretary of Consumer Affairs on House Doc. No. 6742 (Governor's File relating to St. 1980, c. 484, State House Archives, July 15, 1980).

in Caten's dual role as manager of the safe deposit operation and seller of gold, and knowing of Caten's own gold trading business, was negligent in failing to establish more safeguards and in neglecting to provide more supervision. "A board of directors which leaves the custody, control and management of its securities and property to a single officer, no matter how high may be his character and reputation, for a long space of time without supervision, examination or inquiry, is justly subject to the charge of negligence in the performance of its duty." *Ouderkirk* v. *Central Natl. Bank,* 119 N.Y. 263, 272 (1890). *Miller* v. *Viola State Bank,* 121 Kan. 193, 197 (1926). See *Merchants Natl. Bank* v. *Carhart,* 95 Ga. 394, 399 (1894). See also *Mullins* v. *Pine Manor College,* 389 Mass. at 61 (failure to establish adequate system of supervising guards); *Juergens* v. *Venture Capital Corp.,* 1 Mass. App. Ct. 274, 278 (1973).

The absence of any procedure to check gold deliveries, and a key system which enabled an employee who had access to the pass key to be deputized so as to be able to enter a box alone could be found by a jury not to show the degree of care which may be expected from a reasonably prudent safe deposit enterprise. See *Mullins* v. *Pine Manor College,* 389 Mass. at 57 (deficiency in security system could be found in single key system).

3. Although the defendant claims there was insufficient evidence of causation, we think this question was for the jury. O'Malley was not required to show that Vaults' conduct was the sole cause of his loss. He met his burden if he introduced evidence from which a jury could reasonably conclude that it was more probable than not that the negligence of Vaults was a substantial cause of the loss. *Mullins* v. *Pine Manor College,* 389 Mass. at 62. Restatement (Second) of Torts § 465 (1965).

We think it could reasonably be inferred that, had Vaults established a system of supervision, the discrepancies in the deliveries of gold to customers, which Caten testified occurred from 1977 onward, would have been discovered, and that Caten would have been removed from the business

of dealing in gold. The jury could also have concluded that, had there been more supervision of the safe deposit operation and establishment of proper procedures, Caten, even if deputized by O'Malley, would not have been able to open the box alone.

4. The defendant argues that the plaintiff's negligence in giving Caten the key to his box was the sole proximate cause of the theft and that the plaintiff cannot recover even if the defendant could be found to have been negligent. As we have indicated, the evidence permits a finding that the defendant was negligent and that its negligence was a proximate cause of the plaintiff's loss. In such circumstances, we cannot say, as matter of law, that the plaintiff's conduct was the sole cause of his loss.[10] It was for the jury to determine the degree of fault of each party and to diminish the plaintiff's damages as provided in G. L. c. 231, § 85, the comparative negligence statute.

5. As the question of the applicability of G. L. c. 231, § 85, will arise at retrial, we deem it appropriate to address that issue. The statute, inserted by St. 1973, c. 1123, § 1, applies to actions "by any person . . . to recover damages for negligence resulting in death or in injury to person or property" and provides for apportionment of damages if the plaintiff's contributory negligence "was not greater than the total amount of negligence attributable to the person or persons against whom recovery is sought."

The only theory on which the plaintiff can recover, on the record before us, is for negligence, even if the duty of care arose out of the rental contract. *Abrams* v. *Factory Mut. Liab. Ins. Co.*, 298 Mass. at 144. In an action for

---

[10] As pointed out in Prosser, Torts 417 (4th ed. 1971), the plaintiff's negligence should not be viewed as "an intervening, or insulating, cause between the defendant's negligence and the result." Rather, the negligence of the plaintiff and that of the defendant are each one of the causes without which the injury would not have occurred. If the plaintiff's negligence were the sole cause of the injury, it would not "contribute" to the loss, but would be the source of a self-inflicted injury. Green, Contributory Negligence and Proximate Cause, 6 N.C. L. Rev. 3, 11-12 (1927). See also Schwartz, Comparative Negligence §§ 4.3-4.5 (1974).

negligence, recovery is permitted if a plaintiff proves harm resulting from the defendant's breach of a duty of care owed to the plaintiff. Under G. L. c. 231, § 85, if the injured person's unreasonable conduct "also has been a cause of his injury, his conduct will be accounted for in apportioning liability or damages." *Correia* v. *Firestone Tire & Rubber Co.*, 388 Mass. 342, 354 (1983). The statute clearly applies to the negligence count and we hold it applies to the contract count, as well.

Count three, as we have indicated, is also based on negligence, and we believe that *Correia,* although holding the statute inapposite in cases where strict liability is involved, strongly suggests its applicability where negligence is the underlying theory of the complaint. *Id.* at 354-355. To hold otherwise would have the result depend on the form of pleading alone. See *Knowles* v. *Gilchrist Co.*, 362 Mass. 642, 645, 650 (1972). "The duty of the defendant is the same whether the action is in tort or in contract," *Thomas* v. *Massachusetts Bay Transp. Authy.*, 389 Mass. 408, 410 (1983), and the amount of the recovery ought to be the same in either case. *Scandura* v. *Trombly Motor Coach Serv., Inc.*, 370 Mass. 612, 618 (1976). Thus, the language, as well as the policy of G. L. c. 231, § 85, described in *Correia* at 354, are here strictly implicated. Cf. *Vannah* v. *Hart Private Hosp.*, 228 Mass. at 139; *Mannis* v. *Pine Hills Taxi Co.*, 87 Misc.2d 680, 681 (N.Y., Albany City Ct., 1976); *Wilson* v. *Citizens Cent. Bank,* 56 Ohio App. 478, 482 (1936). See also Swanton, Contributory Negligence as a Defence to Actions for Breach of Contract, 55 Austl. L.J. 278, 280-283 (1981). Williams, Joint Torts and Contributory Negligence 328 (Stevens & Sons Ltd., London, 1951).

6. In summary, the judge was correct in allowing the defendant's motion for a directed verdict on count one but should have permitted count two, and, to the extent that count three relied on a theory of breach of a duty of care,

i.e., negligence, should have also permitted count three, to go to the jury.[11]

The judgment is reversed, and the matter is remanded to the Superior Court for proceedings consistent with this opinion.

*So ordered.*

---

[11] We note that it would have been preferable for the judge to deny the motion for a directed verdict and follow the procedure set forth in *Smith* v. *Ariens Co.*, 375 Mass. 620, 627-628 (1978). See *Cort* v. *Bristol-Myers Co.*, 385 Mass. 300, 304 n.4 (1982).